ORAL ARGUMENT HAS NOT BEEN SCHEDULED

No. 13-7103

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

CHEVRON CORPORATION AND
TEXACO PETROLEUM COMPANY,

Petitioners-Appellees,

v.

THE REPUBLIC OF ECUADOR,

Respondent-Appellant.

_____

On Appeal from the United States District Court for the
District of Columbia, Case No. 1:12-cv-1247-JEB

_____

## BRIEF OF APPELLEES

_____

Brian A. White
KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, GA  30309
Telephone:  (404) 572-4739
Facsimile:  (404) 572-5100


Caline Mouawad
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY  10036
Telephone:  (212) 556-2172
Facsimile:  (212) 556-2222

Jeffrey S. Bucholtz
Brian Callanan
James P. Sullivan
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone:  (202) 737-0500
Facsimile:  (202) 626-3737
jbucholtz@kslaw.com

*Counsel for Appellees*

Initial Brief: July 18, 2014

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

In accordance with Circuit Rule 28(a)(1), the undersigned counsel of record for Appellees Chevron Corporation and Texaco Petroleum Company hereby certify as follows:

### A.  Parties

#### 1.  Parties Before The District Court

The following is a list of all parties who appeared before the District Court in the underlying proceedings:

> Chevron Corporation
> Texaco Petroleum Company
> The Republic of Ecuador

#### 2.  Parties Before The Court

The following is a list of all parties who have appeared in this Court in this appeal:

> Chevron Corporation
> Texaco Petroleum Company
> The Republic of Ecuador

### B.  Rulings Under Review

The ruling under review is the June 6, 2013 Memorandum Opinion (Dkt. 30) and Order (Dkt. 29) of the U.S. District Court for the District of Columbia (Hon. James E. Boasberg) in Civil Action No. 12-

1247 granting Petitioners' Motion to Confirm an Arbitral Award, confirming the Award, and entering judgment for Petitioners and against the Republic of Ecuador.

## C.    Related Cases

This case has not previously been before this Court or any other court and there are no related cases.

## CORPORATE DISCLOSURE STATEMENT

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Appellees submit the following:

Appellee Chevron Corporation ("Chevron") states that it is a publicly traded company (NYSE: CVX) that has no parent company. No publicly traded company owns 10% or more of its shares.

Appellee Texaco Petroleum Company ("TexPet") is an indirect subsidiary of Chevron, a publicly held corporation. No other publicly held company owns ten percent or more of TexPet's stock.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
        CASES ....................................................................................i

CORPORATE DISCLOSURE STATEMENT ....................................... iii

TABLE OF CONTENTS ..................................................................iv

TABLE OF AUTHORITIES.................................................................vi

GLOSSARY OF ABBREVIATIONS ..................................................xi

JURISDICTIONAL STATEMENT ......................................................1

INTRODUCTION.................................................................................2

STATUTES AND REGULATIONS ......................................................6

STATEMENT OF ISSUES.....................................................................6

STATEMENT OF THE CASE ...............................................................7

      A.    The U.S.-Ecuador Bilateral Investment Treaty....................7

      B.    Chevron's Investments In Ecuador ......................................8

      C.    The Arbitration ....................................................................12

      D.    Ecuador's Annulment Action .............................................15

      E.    Proceedings Below...............................................................17

      F.    This Appeal ..........................................................................21

SUMMARY OF ARGUMENT .............................................................24

STANDARD OF REVIEW...................................................................29

ARGUMENT ........................................................................................29

I.    The District Court Correctly Held That The FSIA's
        Arbitration Exception Denies Ecuador Immunity From This
        Action......................................................................................29

A.  Pleading A Non-Frivolous Claim Suffices To Invoke The FSIA's Arbitration Exception. .......................................30

B.  The Arbitrability Of Chevron's Claims Is Not A "Jurisdictional Fact."...............................................................36

1.  The FSIA's Arbitration Exception Requires Only That The Award Was Issued Pursuant To The BIT And Is Governed By The New York Convention. ...............................................................36

2.  The Chevron-Ecuador Agreement Is An Equally Valid Basis For Invoking The FSIA Arbitration Exception. ...............................................................43

II.  The District Court Correctly Held That There Is No Basis To Deny Confirmation Under The New York Convention. ...............52

A.  The Tribunal's Arbitrability Ruling Forecloses Ecuador's Beyond-The-Scope Defense. ...............................53

1.  Because The Parties Agreed To Arbitrate Questions Of Arbitrability, Deference To The Tribunal's Decision Is Required. ...............................54

2.  The Tribunal Properly Determined That It Had Jurisdiction...............................................................61

B.  The Award Is Not Contrary To Public Policy. ......................71

CONCLUSION ................................................................74

CERTIFICATE OF COMPLIANCE......................................75

CERTIFICATE OF SERVICE...............................................76

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Agudas Chasidei Chabad of U.S. v. Russian Federation,*
  528 F.3d 934 (D.C. Cir. 2008)...............4, 24, 31, 32, 33, 34, 36, 37, 51

*Arthur Andersen LLP v. Carlisle,*
  556 U.S. 624 (2009) .........................................................................32

*Artis v. Bernanke,*
  630 F.3d 1031 (D.C. Cir. 2011)......................................................57

*AT&T Techs., Inc. v. Commc'ns Workers of Am.,*
  475 U.S. 643 (1986) .........................................................................20

*Beiser v. Weyler,*
  284 F.3d 665 (5th Cir. 2002) ..........................................................32

*Belize Social Dev. Ltd. v. Belize,*
  668 F.3d 724 (D.C. Cir. 2012)........................................................52

*Bell v. Hood,*
  327 U.S. 678 (1946) ....................................................... 24, 31, 33, 34

*BG Group PLC v. Republic of Argentina,*
  134 S. Ct. 1198 (2014) .......................................................22, 23, 61

*BG Group PLC v. Republic of Argentina,*
  665 F.3d 1363 (D.C. Cir. 2012)..................................................22, 60

*Cargill Int'l S.A. v. M/T Pavel Dybenko,*
  991 F.2d 1012 (2d Cir. 1993).....................................................34, 35

*China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.,*
  334 F.3d 274 (3d Cir. 2003).............................................................59

*Comm'ns Imp. Exp. S.A. v. Republic of the Congo,*
  No. 13-7004, 2014 WL 3377337 (D.C. Cir. July 11, 2014)...............52

*Contec Corp. v. Remote Solution Co.,*
  398 F.3d 205 (2d Cir. 2005).......................................................54, 58

*Creighton Ltd. v. Qatar,*
  181 F.3d 118 (D.C. Cir. 1999)...................................................19, 43

*Cytori Therapeutics, Inc. v. FDA,*
  715 F.3d 922 (D.C. Cir. 2013).........................................................41

*E. Assoc. Coal Corp. v. United Mine Workers of Am.*,
  531 U.S. 57 (2000) ............................................................... 62

*Ehrlich v. Am. Airlines*,
  360 F.3d 366 (2d Cir. 2004) ............................................. 70

*Exportal Ltda. v. United States*,
  902 F.2d 45 (D.C. Cir. 1990) ............................................ 42

*First Inv. Corp. v. Fujian Mawei Shipbuilding, Ltd.*,
  703 F.3d 742 (5th Cir. 2013) ............................................ 35

*First Options of Chi., Inc. v. Kaplan*,
  514 U.S. 938 (1995) ............................... 3, 27, 43, 54, 55, 61

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
  905 F.2d 438 (D.C. Cir. 1990) ..................................... 34, 52

*Grynberg v. BP P.L.C.*,
  596 F. Supp. 2d 74 (D.D.C. 2009) .................................... 55

*LaPrade v. Kidder, Peabody & Co.*,
  246 F.3d 702 (D.C. Cir. 2001) ......................................... 29

*Medellín v. Texas*,
  552 U.S. 491 (2008) ..................................................... 72, 73

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985) ......................................................... 52

*Oracle Am., Inc. v. Myriad Grp. A.G.*,
  724 F.3d 1069 (9th Cir. 2013) ......................................... 55

*Orlando Residence, Ltd. v. GP Credit Co.*,
  553 F.3d 550 (7th Cir. 2009) ........................................... 52

*Phoenix Consulting, Inc. v. Republic of Angola*,
  216 F.3d 36 (D.C. Cir. 2000)............................. 19, 25, 34, 37

*Potter v. District of Columbia*,
  558 F.3d 542 (D.C. Cir. 2009)............................................ 71

*Price v. Socialist People's Libyan Arab Jamahiriya*,
  389 F.3d 192 (D.C. Cir. 2004)...................................... 29, 44

*Randall v. Sorrell*,
  548 U.S. 230 (2006) ......................................................... 41

*Republic of Ecuador v. Chevron Corp.,
    638 F.3d 384 (2d Cir. 2011)............................. 5, 27, 44, 55, 57, 58, 61

Riordan v. SEC,
    627 F.3d 1230 (D.C. Cir. 2010)........................................................ 42

Sarhank Grp. v. Oracle Corp.,
    404 F.3d 657 (2d Cir. 2005)....................................................... 33, 35

*Schneider v. Kingdom of Thailand,
    688 F.3d 68 (2d Cir. 2012)............................ 48, 49, 50, 55, 58, 59, 61

Steel Co. v. Citizens for a Better Env't,
    523 U.S. 83 (1998) ........................................................................... 34

Tahan v. Hodgson,
    662 F.2d 862 (D.C. Cir. 1981)......................................................... 53

Telenor Mobile Commc'ns AS v. Storm LLC,
    584 F.3d 396 (2d Cir. 2009)...................................................... 28, 71

TermoRio S.A. E.S.P. v. Electranta S.P.,
    487 F.3d 928 (D.C. Cir. 2007)......................................................... 52

TMR Energy Ltd. v. State Prop. Fund of Ukr.,
    411 F.3d 296 (D.C. Cir. 2005).............................................. 34, 40, 53

VRG Linhas Aereas S.A. v.
    MatlinPatterson Global Opportunities Partners II L.P.,
    717 F.3d 322 (2d Cir. 2013)............................................................ 59

## Arbitration Cases

Fedax NV v. Venezuela,
    ICSID Case No. ARB/96/3,
    Decision of the Tribunal on Objections to Jurisdiction
    (July 11, 1997) ................................................................................. 64

Feldman v. Mexico,
    ICSID Case No. ARB(AF)/99/1,
    Interim Decision (Dec. 6, 2000)...................................................... 69

GEA Group Aktiengesellschaft v. Ukraine,
    ICSID Case No. ARB/08/16, Award (Mar. 31, 2011) ....................... 64

*MCI Power Group L.C. v. Republic of Ecuador*,
    ICSID Case No. ARB/03/6, Award (July 31, 2007) ........................... 69

*Mondev Int'l Ltd. v. United States*,
    NAFTA Case No. ARB(AF)/99/2, Award (Oct. 11, 2002) ........... 68, 69

*Occidental Exploration v. Republic of Ecuador*,
    LCIA Case No. UN 3467 (July 1, 2004) ........................................... 64

*SGS Société Générale de Surveillance S.A. v.*
    *Republic of the Philippines*, ICSID Case No. ARB/01/6,
    Decision of the Tribunal on Objections to Jurisdiction
    (Jan. 29, 2004) ................................................................................ 64

*Tecnicas Medioambientales Tecmed SA v. Mexico*,
    ICSID Case No. ARB(AF)/00/02, Award (May 29, 2003) ................. 69

## Statutes and Treaties

9 U.S.C. § 3 ............................................................................................ 32

9 U.S.C. § 16 .......................................................................................... 32

9 U.S.C. § 201 ......................................................................................... 8

9 U.S.C. § 205 ........................................................................................ 32

9 U.S.C. § 207 ........................................................... 17, 26, 43, 52, 73

28 U.S.C. § 1330 ..................................................................................... 1

28 U.S.C. § 1605 ........................................... 1, 3, 17, 24, 30, 31, 38, 39

28 U.S.C. § 2342 .................................................................................... 42

Convention on the Recognition and Enforcement of
    Foreign Arbitral Awards,
    21 U.S.T. 2517, 330 U.N.T.S. 3 (June 10, 1958) ............ 18, 25, 43, 58

Treaty Between The United States of America and
    The Republic of Ecuador Concerning the Encouragement
    and Reciprocal Protection of Investments,
    U.S.-Ecuador, Aug. 27, 1993, S. Treaty Doc. No. 103-15
    (entered into force May 11, 1997) ................................. 7, 8, 12, 15, 18,
                                        21, 28, 44, 46, 47,
                                     48, 58, 63, 66, 71, 72

Treaty Concerning the Encouragement and
    Reciprocal Protection of Investments, Ger.-Thai.,
    2286 U.N.T.S. 160 (June 24, 2002) ...................................................50

Vienna Convention on the Law of Treaties,
    1155 U.N.T.S. 331 (May 23, 1969) ...................................................68

## Other Authorities

BORN, GARY B.,
    INTERNATIONAL COMMERCIAL ARBITRATION (2009)................ 54, 56, 58

*Draft Articles on the Law of Treaties with Commentaries*,
    Rept. of the International Law Commission
    to the General Assembly (1966) ........................................................68

Kühn, Wolfgang,
    *Practical Problems Related to BITs in International Arbitration*,
    in INVESTMENT TREATIES & ARBITRATION (2002).............................66

*Arbitral Rules of the United Nations
    Commission on International Trade Law,
    G.A. Res. 31/98, U.N. Doc. A/RES/31/98
    (Dec. 15, 1976) ............................................................. 15, 20, 54, 57

VANDEVELDE, KENNETH J.,
    U.S. INVESTMENT TREATIES: POLICY AND PRACTICE (1992)................62

\* Authorities upon which we chiefly rely are marked with asterisks

# GLOSSARY OF ABBREVIATIONS

**Award**

Interim Award, Partial Award on the Merits, and Final Award, collectively (Dkts. 22-3, 22-4, 22-5)

**BIT**

Treaty Concerning the Encouragement and Reciprocal Protection of Investment, U.S.-Ecuador, Aug. 27, 1993, S. Treaty Doc. 103-15 (entered into force May 11, 1997)

**FSIA**

Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602 *et seq.*

**Investment Agreement**

Agreement between the Government of Ecuador and Ecuadorian Gulf Oil Company and Texaco Petroleum Company, Aug. 6, 1973 (as amended in 1977)

**New York Convention or N.Y. Conv.**

Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, 330 U.N.T.S. 3 (June 10, 1958)

**UNCITRAL Rules**

Arbitral Rules of the United Nations Commission on International Trade Law, G.A. Res. 31/98, U.N. Doc. A/RES/31/98 (Dec. 15, 1976).

## JURISDICTIONAL STATEMENT

Ecuador's brief omits the basis for the District Court's jurisdiction: 28 U.S.C. § 1330(a) confers "original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state" with respect to any claim from which the foreign state is not immune under the Foreign Sovereign Immunities Act (FSIA). Because this is an action to confirm an arbitral award made pursuant to Ecuador's agreement to arbitrate and governed by the New York Convention, the FSIA's arbitration exception applies. *See* 28 U.S.C. § 1605(a)(6) & (a)(6)(B).

## INTRODUCTION

This appeal is Ecuador's latest attempt to evade its obligations under a final and binding arbitral award. Years ago, Chevron initiated an arbitration under the U.S.-Ecuador bilateral investment treaty ("BIT") to protect its rights to nearly $700 million in legal claims arising from Ecuador's breach of an investment agreement. A distinguished arbitral tribunal, including Ecuador's chosen arbitrator, unanimously held that the BIT authorized arbitration of Chevron's claims; found Ecuador liable; and entered a final award for Chevron. The District Court granted Chevron's petition to confirm the Award.

Ecuador's central argument on appeal is that Chevron's claims were beyond the scope of the BIT and thus not "arbitrable." The fatal problem with that argument is that Ecuador agreed that the Tribunal, not national courts, would resolve that question. The BIT adopts the Arbitral Rules of the United Nations Commission on International Trade Law—commonly known as the UNCITRAL Rules—and those rules delegate to arbitrators the power to resolve all questions of arbitrability. That was Ecuador's choice. And the unavoidable consequence of that choice is that a U.S. court "must defer to [the]

2

arbitrator's arbitrability decision." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).

In an attempt to obliterate that term of its treaty, Ecuador has gotten creative. Ecuador insists that the scope of arbitrable disputes under the BIT is a jurisdictional issue under the FSIA requiring *de novo* review. But arbitrability goes to the jurisdiction of arbitrators—not U.S. courts. In a confirmation action under the New York Convention such as this, the scope or validity of an arbitration agreement is a merits question. There is no authority whatsoever for the "unprecedented merits-based review" of an arbitral award that Ecuador seeks in the guise of the FSIA's jurisdictional analysis. Dist. Ct. Mem. Op. ("Op.") 6.

To the contrary, under the FSIA's arbitration exception, a district court has jurisdiction (and a sovereign is not immune) when a plaintiff brings an "action . . . to confirm an award made pursuant to . . . an agreement [to arbitrate] made by the foreign state with or for the benefit of a private party" if "the agreement or award is or may be governed by" the New York Convention or a similar treaty "calling for the recognition and enforcement of arbitral awards." 28 U.S.C.

3

§ 1605(a)(6). This Court has held that where, as here, an FSIA exception "depends on the plaintiff's asserting a particular type of claim," the plaintiff need only non-frivolously assert that type of claim. *Agudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934, 940 (D.C. Cir. 2008). Chevron's petition for confirmation easily satisfies that standard. That is the end of the jurisdictional analysis under section 1605(a)(6).

Without acknowledging this Court's precedent, Ecuador tries to clear a path to *de novo* review of the Award by asserting that section 1605(a)(6) identifies "jurisdictional facts" that must be proven. Ecuador is wrong, but jurisdiction would be proper even if Ecuador were right. The only "jurisdictional facts" that section 1605(a)(6) could possibly create would be the terms set forth in that provision, which the District Court independently and correctly resolved: By signing the BIT, Ecuador entered into an agreement for the benefit of private investors to submit to arbitration; the Award was "made pursuant to" the BIT; and Ecuador concedes that the Award is governed by the New York Convention. Whether the Tribunal correctly found Chevron's claims to be arbitrable under the BIT does not bear on section 1605(a)(6) at all.

The result is the same if the Chevron-Ecuador arbitration agreement (rather than the BIT) is viewed as the predicate "agreement" under section 1605(a)(6). Ecuador attempts to reframe its challenge to whether Chevron's claims fall within the *scope* of the BIT as an attack on the *existence* of an arbitration agreement. But there is no genuine dispute that "Ecuador, by signing the BIT, and Chevron, by consenting to arbitration, have created a separate binding agreement to arbitrate." *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 392 (2d Cir. 2011). Ecuador was more forthright below, where it explained that the real issue here is "whether a particular dispute falls within an existing arbitration agreement," not whether a "valid arbitration agreement exists at all." Dkt. 18, at 24 n.1.

Like its *faux*-jurisdictional arguments, Ecuador's merits defenses under the New York Convention are designed to escape the consequences of its agreement. Ecuador's beyond-the-scope defense is foreclosed by the Tribunal's binding determination that Chevron's claims were arbitrable under the BIT—a determination that, again, Ecuador delegated to the Tribunal by adopting the UNCITRAL Rules. The Tribunal's decision easily survives the highly deferential review

5

that controls here, and, as the District Court found, it would survive "even the more searching form of review Ecuador contends is applicable here." Op. 14–16. And Ecuador's "public-policy" defense under the New York Convention is nothing more than an attempt to relitigate the arbitrability question in yet another guise.

Ecuador cannot escape the consequences of its decision to delegate to the Tribunal the authority to decide whether Chevron's claims fall within the scope of the BIT. The District Court correctly confirmed the Award, and this Court should affirm.

## STATUTES AND REGULATIONS

Applicable statutory and treaty provisions are reproduced in a separate addendum.

## STATEMENT OF ISSUES

1.    Whether the FSIA's arbitration exception requires a district court, before exercising subject-matter jurisdiction over an action to confirm an arbitral award, to decide *de novo* whether the arbitrators correctly found the claims to be arbitrable.

2.    Whether the District Court erred in rejecting Ecuador's objections to confirmation of the arbitral award entered against it pursuant to the New York Convention.

6

**STATEMENT OF THE CASE**

**A.    The U.S.-Ecuador Bilateral Investment Treaty**

In 1993, the United States and Ecuador signed a bilateral investment treaty guaranteeing reciprocal protections to investors from each nation.  *See* Treaty Between The United States of America and The Republic of Ecuador Concerning the Encouragement and Reciprocal Protection of Investments, U.S.-Ecuador, Aug. 27, 1993, S. Treaty Doc. No. 103-15 (entered into force May 11, 1997) (the "BIT") (Dkt. 22-1). Bilateral investment treaties are an essential tool "to protect private investment, to develop market-oriented policies in partner countries, and to promote U.S. exports."[1]

Like most treaties of its kind, the U.S.-Ecuador BIT is at once a completed agreement between the signatory nations to submit to arbitration for the benefit of their "national[s]" and "compan[ies]" and a standing offer by each nation addressed to investors to arbitrate disputes.  BIT art. VI § 3.  By executing the BIT, Ecuador consented to arbitrate "any investment dispute" with a U.S. company.  *Id.* § 4.  A

[1] U.S. Trade Representative, Bilateral Investment Treaties, *available at* http://www.ustr.gov/trade-agreements/bilateral-investment-treaties (last visited July 18, 2014).

U.S. company can accept Ecuador's open offer to arbitrate by simply submitting a notice of arbitration. *Id.* At that point, the state and the investor have formed "an 'agreement in writing' for purposes of Article II of the [New York] Convention," *id.* § 4(b)—an international agreement governing recognition and enforcement of foreign arbitral awards, codified by the Federal Arbitration Act, 9 U.S.C. § 201.

### B.    Chevron's Investments In Ecuador

In 1973, Texaco Petroleum Company ("TexPet"), now a subsidiary of Chevron, entered into an investment agreement with Ecuador and its state-owned oil company, CEPE. Dkt. 22-3 ¶ 52. The 1973 agreement, along with a 1977 amendment (collectively the "Investment Agreement"), permitted TexPet to explore and develop crude oil reserves in Ecuador. In return, TexPet was required to provide a percentage of its output to Ecuador to meet domestic consumption needs, at a price set by Ecuador. *Id.* ¶ 53. Once TexPet satisfied its obligation to contribute oil for domestic consumption, it was free to export the remainder of its output at the (substantially higher) international market price. *Id.* The Investment Agreement provided

8

that Ecuador would pay TexPet the international market price for any oil purchased for purposes other than domestic consumption. *Id*.

In March 1987, a major earthquake damaged the Trans-Ecuadorian Oil Pipeline and effectively severed the connection between TexPet's oil fields and coastal refineries. Dkt. 22-4 ¶ 130. As a result, TexPet's production dropped significantly. *Id*. During the roughly six months that it took to repair the pipeline, TexPet delivered as much oil as it could transport by alternative means. *Id*. ¶ 131. Meanwhile, CEPE bartered fuel oil from another source to obtain enough crude oil to meet domestic consumption demands. *Id*.

After normal crude oil production and transport resumed, Ecuador required TexPet to deliver approximately 1.4 million barrels of crude oil, which Ecuador then sold to recoup the cost of the fuel oil bartered when the pipeline was inoperable. *Id*. ¶ 132. TexPet received the fixed domestic price for this requisitioned crude. *Id*.

Between December 1991 and December 1993, TexPet filed seven breach-of-contract cases against Ecuador in Ecuadorian courts. *Id*. ¶ 134. TexPet claimed over $553 million in damages. TexPet's lawsuits alleged that Ecuador breached the Investment Agreement and violated

9

Ecuadorian law. *Id*. ¶ 135. In five of the cases, TexPet claimed that Ecuador had misstated its domestic consumption needs and thereby appropriated more oil than it was entitled to acquire at the fixed domestic price. *Id*. The other two cases involved a *force majeure* issue related to the 1987 earthquake and an alleged breach of a 1986 refinancing agreement. *Id*. For the next several years, TexPet continued to pursue these claims in Ecuadorian courts, without resolution.

With the Investment Agreement set to expire in June 1992, TexPet and CEPE's successor, PetroEcuador, tried to negotiate an extension but did not reach agreement. Dkt. 22-3 ¶ 54. TexPet, PetroEcuador, and Ecuador then began to discuss the termination of the Investment Agreement. *Id*.

In November 1995, Ecuador, PetroEcuador, and TexPet reached an agreement that resolved most outstanding issues under the Investment Agreement. Dkt. 19-11. The 1995 settlement agreement formally "terminated" the Investment Agreement, but as the Arbitral Tribunal explained, Article 4.6 of the settlement expressly "excluded . . .

all pending claims which 'exist[ed] judicially between the parties', which included TexPet's seven court cases." Dkt. 22-4 ¶ 138.

The BIT took effect in May 1997. Dkt. 22-3 ¶ 60. Starting in 2004, a number of state actions destabilized and diminished the independence of the Ecuadorian judiciary. In 2004, Ecuador's Congress dismissed members of the Constitutional Court, Electoral Court, and Supreme Court. *Id.* ¶ 63. In 2005, the President declared a state of emergency, suspended certain civil rights, and dismissed all of the newly appointed Supreme Court judges. *Id.* The Congress then adopted a new scheme to appoint Supreme Court judges. *Id.* ¶ 64.

Meanwhile, TexPet's lawsuits to vindicate its rights under the Investment Agreement languished in Ecuadorian courts for well over a decade. Although TexPet asserted strong, substantiated claims in each of its seven breach-of-contract cases, none of the cases was adjudicated until late 2006—only after Chevron had filed its notice of arbitration under the BIT. These delays occurred despite TexPet's carrying its evidentiary burdens and despite the Ecuadorian courts' determinations that most of the cases were ready for decision by the late 1990s.

11

### C.    The Arbitration

Chevron filed its notice of arbitration against Ecuador in December 2006, alleging that Ecuador had breached the BIT and international law by unduly delaying TexPet's seven court cases. Dkt. 22-2. The notice invoked Article VI § 3(a)(iii) of the BIT, which permits investors to submit disputes to arbitration under the UNCITRAL Rules. *Id*. at 10.

A three-member Tribunal, comprising some of the world's most respected arbitrators, presided.   Dkt. 22-3 ¶ 8; Dkt. 22-2, at 11. Chevron and Ecuador appointed one member each, and those members jointly selected the third.  The Tribunal fixed the seat of arbitration as The Hague, Netherlands. *Id*. ¶¶ 11–16.

The arbitration spanned four years and involved numerous hearings and rounds of briefing consuming thousands of pages.  The first phase, concerning the Tribunal's jurisdiction over the dispute, took about eight months and involved two rounds of briefing and a hearing. *Id*. ¶ 114.

In December 2008, the Tribunal issued its unanimous, 140-page Interim Award rejecting Ecuador's challenges to its jurisdiction and

concluding that Chevron's claims were arbitrable under the BIT. *Id.*
¶ 115. The Tribunal observed that the BIT's definition of "investment"
is "broad in its general terms" and "enumerates a myriad of forms of
investment that are covered," including "rights, claims, and interests."
*Id.* ¶ 181. The Tribunal noted that Ecuador did not deny that Chevron
"had what would be considered to be an investment in Ecuador in [its]
oil exploration and extraction activities ranging from the 1960s to the
early 1990s." *Id.* ¶ 180. Ecuador argued only that Chevron's "lawsuits
in Ecuadorian courts cannot, on their own, be considered to be an
'investment' under the BIT," *id.*, despite the fact that the BIT expressly
defined the term "investment" to include any "claim to money . . .
associated with an investment" and "any right conferred by law or
contract." BIT art. I § 1(a)(iii), (v). Concluding that the BIT clearly
protects the full lifecycle of an investment, the Tribunal held that
Chevron's "lawsuits concern the liquidation and settlement of claims
relating to the investment and, therefore, form part of that investment."
Dkt. 22-3 ¶ 180.

The Tribunal considered and rejected Ecuador's retroactivity
objection. The BIT applies by its terms "to investments existing at the

13

time of entry into force," art. XII § 1, and the rule against retroactivity "does not mean that a breach must be based solely on acts occurring after the entry into force of the BIT."   Dkt. 22-3 ¶ 283.   Because TexPet's lawsuits constituted an "existing investment" when the BIT took effect in 1997, there was nothing retroactive about Chevron's allegation that Ecuador breached the BIT by unduly delaying adjudication of those claims.  *Id.* ¶ 284.   The critical point was that Ecuador's violations of its BIT obligation to provide "effective means" of protecting investor rights extended beyond 1997, as TexPet's lawsuits remained pending and unresolved long after the BIT took effect.  *Id.* ¶¶ 188–89.

After additional briefing, the Tribunal conducted a multi-day hearing on the merits.  *Id.* ¶ 151.   Chevron presented evidence that Ecuador breached its express obligation under the BIT to "provide effective means of asserting claims and enforcing rights with respect to investment[s], investment agreements, and investment authorizations." Art. II § 7.  Chevron demonstrated that the Ecuadorian courts' fifteen-year refusal to adjudicate TexPet's seven lawsuits—capped by

14

incompetent, biased decisions issued after Chevron initiated arbitration—did not constitute "effective means" of protection.

In 2010, the Tribunal issued a unanimous Partial Award on the Merits in favor of Chevron. Dkt. 22-4. The Tribunal held Ecuador liable for breaching its obligations under the BIT, particularly Article II § 7, and found that Chevron had suffered damages of roughly $700 million.

In 2011, the Tribunal issued a unanimous Final Award. The Tribunal concluded that, after applying Ecuador's 87% tax rate, Chevron was owed $96.3 million in after-tax damages plus interest. Dkt. 22-5. The Final Award is "final and binding" under the BIT and the UNCITRAL Rules. BIT art. VI § 6 ("Each party undertakes to carry out without delay the provisions of any such award and to provide in its territory for its enforcement"); UNCITRAL Arbitration Rules, G.A. Res. 31/98, art. 32 ¶ 2, U.N. Doc. A/RES/31/98 (Dec. 15, 1976) (same).

## D.    Ecuador's Annulment Action

Instead of "carry[ing] out [the Award] without delay," Ecuador petitioned a court in The Hague to set it aside on the ground that Chevron's claims fell outside the scope of Ecuador's agreement to

15

arbitrate in the BIT.  Dkt. 22-6, at 1.  In May 2012, the Hague district court denied Ecuador's petition and rejected all of Ecuador's challenges, including that Chevron's claims were not covered by a valid arbitration agreement.  *Id.* at 10–11.

Ecuador appealed, and the Court of Appeal of The Hague affirmed.  *See* Addendum 11–24.  Because Dutch law permits *de novo* consideration of arbitrability in actions to annul an award where the Netherlands was seat of arbitration, the appellate court conducted a thorough analysis of whether Chevron's claims fell within the scope of the BIT.  Add. 13.  The court concluded that arbitration of Chevron's claims was consistent with the plain text of the BIT and also advanced the treaty's purpose, as fair treatment during the wind-down of investments creates the stability needed to attract new investors.  Add. 19–22.

Ecuador appealed to the Dutch Supreme Court, which has announced its intent to issue its decision on Ecuador's appeal on September 5, 2014.

### E.    Proceedings Below

In July 2012, Chevron petitioned the District Court to confirm the Final Award under the Federal Arbitration Act. Dkt. 1. That statute creates a federal cause of action to enforce arbitral awards governed by the New York Convention and mandates that a district court "shall" confirm such an award unless one of the Convention's narrow defenses applies. 9 U.S.C. § 207. Chevron invoked jurisdiction under the FSIA's arbitration exception, 28 U.S.C. § 1605(a)(6).

Ecuador opposed confirmation on shifting grounds, each designed to entice the District Court to second-guess the Tribunal's arbitrability ruling.[2] First, purporting to challenge subject-matter jurisdiction, Ecuador argued that the FSIA's arbitration exception does not apply because Chevron's claims are outside the scope of the BIT. Dkt. 18, at 11. Second, Ecuador asserted two merits defenses under the New York Convention, which permits (but does not require) a court to refuse recognition of an award that is beyond the scope of the "terms of the submission to arbitration," Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, 330 U.N.T.S.

---

[2] Ecuador also requested a stay pending resolution of its Dutch set-aside action, Dkt. 18, at 27–28, which the court denied, Op. 23.

3, Art. V(1)(c) (June 10, 1958) (New York Convention), or that is "contrary to . . . public policy," Art. V(2)(b).  Ecuador initially denied that the parties had agreed to arbitrate questions of arbitrability, Dkt. 18, at 11–12, before conceding that it is "settled" that the BIT's adoption of the UNCITRAL Rules evinced a "'clear[] and unmistakabl[e]'" agreement to do just that.  Dkt. 26, at 5–6 (citation omitted).  To escape the consequences of its agreement, Ecuador argued that the parties' delegation of decision-making authority to the Tribunal applies only before the Tribunal issues its award and not when the prevailing party seeks to enforce the award.  *Id.* at 6–7.

"Disagreeing on all fronts" with Ecuador, the District Court concluded that jurisdiction is proper and that Ecuador could not relitigate *de novo* its argument that Chevron's claims fell outside the scope of the BIT.  Op. 1.  The court first determined that the FSIA's arbitration exception applies under its plain terms.  *Id.* at 4.  It was self-evident that the Award "was rendered pursuant to the BIT, an agreement that provides for arbitration."  *Id.* (citing Dkt. 22-3, at 1, 39).  Further, Ecuador did not dispute that the Award was "governed by the New York Convention," and "the arbitration exception in § 1605(a)(6)

18

'by its terms' applies to actions to confirm arbitration awards under the New York Convention." *Id.* at 5 (quoting *Creighton Ltd. v. Qatar*, 181 F.3d 118, 123 (D.C. Cir. 1999)).

Noting that "'the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity,'" the court considered and rejected Ecuador's novel argument that a district court must independently decide questions of arbitrability before exercising jurisdiction over a confirmation action. *Id.* at 5–6 (quoting *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).  Observing that Ecuador cited "no authority" for that position, the court instead followed a long line of cases in which courts have found the arbitration exception satisfied without first resolving *de novo* the arbitrability of the underlying claims.  *Id.* at 5–7 (collecting cases).

Turning to the merits, the court explained that "[t]he party resisting confirmation bears the heavy burden of establishing that one of the grounds for denying confirmation in Article V [of the New York Convention] applies." *Id.* at 8.  With respect to Ecuador's beyond-the-scope defense, the court explained that it was not free to review *de novo*

the Tribunal's considered judgment that Chevron's claims were arbitrable. When parties have "'clearly and unmistakably'" agreed to arbitrate the issue of arbitrability, courts must accord "substantial deference" to the arbitrators' decision on that issue. *Id.* at 10, 11 (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)). The court explained that, in the BIT, Ecuador agreed to do precisely that by adopting the UNCITRAL Rules, which state that the tribunal "shall have the power to rule on objections that it has no jurisdiction." *See id.* at 13 (quoting UNCITRAL Rules, art. 21 ¶ 1). As Ecuador conceded, "binding precedent dictates that in the context of a bilateral investment treaty, 'incorporation of the UNCITRAL Rules provides clear[] and unmistakabl[e] evidence[] that the parties intended for the arbitrator to decide questions of arbitrability.'" *Id.* (citation omitted).

The District Court went on to find that the Tribunal's "well reasoned and comprehensive" decision easily passed deferential review and, indeed, would survive "even the more searching form of review Ecuador contends is applicable here." *Id.* at 14–16. Retracing the steps in the Tribunal's arbitrability decision, the court found "nothing

objectionable" in the conclusion that, given the BIT's broad definition of investment, Chevron's lawsuits "'concern the liquidation and settlement of claims relating to [Chevron's initial investment in Ecuador] and, therefore, form part of that investment.'" *Id.* at 15 (quoting Dkt. 22-3 ¶ 180).

The court also rejected Ecuador's defense under the New York Convention's public-policy exception, which "is construed extremely narrowly." *Id.* at 16–17. Ecuador and the United States "willingly" agreed to arbitrate claims that their respective courts had failed to protect investor rights conferred by the BIT, *id.* at 18–19 (citing BIT art. VI §§ 1–3), and it "strains credulity" to argue that merely enforcing that agreement violates the "most basic notions of morality and justice." *Id.* (internal quotation marks omitted).

Finding no permissible defense to confirmation, the court confirmed the Award and entered judgment for Chevron in the amount of $96 million plus interest.

## F.    This Appeal

After filing its notice of appeal, Ecuador moved for a stay pending the Supreme Court's review of this Court's decision in *BG Group PLC v.*

*Republic of Argentina*, 665 F.3d 1363 (D.C. Cir. 2012), *rev'd*, 134 S. Ct. 1198 (2014).  This Court granted Ecuador's motion on October 17, 2013.

The panel in *BG Group* had held that the UNCITRAL Rules were not "triggered" until a procedural precondition to arbitration was satisfied, and declined to defer to the arbitrators' interpretation and application of that precondition.  665 F.3d at 1367.  In seeking a stay, Ecuador predicted that "the Supreme Court is likely to address whether the fact that the alleged agreement to arbitrate is found in an international treaty, rather than in a private contract between arbitrating parties, changes the standard of review and reduces or eliminates the deference to arbitral findings that otherwise would be predicated on the federal policy in favor of arbitral dispute resolution." Stay Reply 1.  "If the Supreme Court affirms this Court's holding in *BG Group* that such a determination rests properly with the court," Ecuador argued, "then this Court will need to undertake the fresh analysis in which the district court declined to engage."  Stay Mot. 2. And in an amicus brief submitted in *BG Group*, Ecuador urged the Supreme Court to "hold squarely that a State's consent-based objection

22

to arbitration is subject to *de novo* review."  Ecuador Amicus Br. 13, *BG Group*, No. 12-138 (U.S. Nov. 1, 2013).

On March 5, 2014, the Supreme Court reversed this Court's decision in *BG Group* and flatly rejected Ecuador's hoped-for position that arbitral rulings issued pursuant to an investment treaty are entitled to less deference than those issued pursuant to a private agreement.  134 S. Ct. at 1208–09.  Ecuador now relies primarily on the dissent and the reversed panel opinion.  Br. 50, 55–56.

## SUMMARY OF ARGUMENT

The judgment below should be affirmed.

I.    A foreign sovereign's immunity from an arbitral-award confirmation action does not turn on whether the arbitrators correctly resolved questions of arbitrability committed to them.   The District Court therefore correctly declined to decide that issue *de novo*.

A.  Ecuador's attack on jurisdiction begins from the false premise that the components of the FSIA's arbitration exception are facts that must be proven, rather than a description of the type of claim over which Congress provided jurisdiction.  But where, as here, "jurisdiction depends on the plaintiff's asserting a particular type of claim, and it has made such a claim, there typically is jurisdiction unless the claim is 'immaterial and made solely for the purpose of obtaining jurisdiction or wholly insubstantial and frivolous.'"   *Chabad*, 528 F.3d at 940 (alteration omitted) (quoting *Bell v. Hood*, 327 U.S. 678, 682–83 (1946)). Chevron easily satisfied that standard by non-frivolously pleading precisely the type of claim for which 28 U.S.C. § 1605(a)(6) denies immunity: "an action . . . brought . . . to confirm an award" issued pursuant to "an agreement [to arbitrate] made by the foreign state with

24

or for the benefit of a private party" and governed by the New York Convention.  That concludes the jurisdictional inquiry.

B.  Even if Ecuador were correct that section 1605(a)(6) sets out *facts* that must be proven, that would get Ecuador nowhere.  Ecuador argues that the District Court should have resolved two "contested jurisdictional fact[s]": (1) the existence of an agreement to arbitrate, and (2) the arbitrability of Chevron's claims under that agreement.  Br. 23–24.  But the first fact is not genuinely contested, and the second is not jurisdictional.

First, Ecuador admits signing the BIT, and the District Court correctly and independently concluded that the BIT qualifies as an arbitration "'agreement made by [Ecuador] with or for the benefit of a private party'"—namely, U.S. companies.  Op. 4 (citation omitted).

Second, the arbitrability of Chevron's claims under the BIT is *not* a fact that is "necessary" to jurisdiction.  *Phoenix Consulting*, 216 F.3d at 40.  Nothing in section 1605(a)(6) refers to arbitrability, which is instead a merits question pertaining to whether the Award should be confirmed.  *See* N.Y. Conv. art. V(1)(c).  Ecuador cites no authority for the "unprecedented merits-based review" it demands under the FSIA,

Op. 6, but instead rests its novel argument on section 1605(a)(6)'s reference to awards made "pursuant to" an arbitration agreement.  Br. 22.  That slender reed cannot bear such weight.  "[P]ursuant to" does not mean *correctly* pursuant to, as this Court routinely recognizes when exercising jurisdiction under laws authorizing direct review of government actions taken "pursuant to" particular statutory provisions. It is self-evident that the Tribunal issued the Award here pursuant to the BIT, as the District Court recognized.  Whether the Tribunal correctly construed the scope of the BIT has no bearing on whether the District Court had jurisdiction.

II.  On the merits, because Ecuador failed to establish any of the narrow defenses against recognition available under the New York Convention, the District Court correctly held that the Federal Arbitration Act compels confirmation.  *See* 9 U.S.C. § 207.

A.  The Tribunal's binding determination that Chevron's claims were within the scope of the BIT forecloses Ecuador's Article V § 1(c) defense that the Award was beyond the scope of "the submission to arbitration."  It is well-settled that "a court must defer to an arbitrator's arbitrability decision when the parties submitted that matter to

26

arbitration." *First Options*, 514 U.S. at 943.  Ecuador turns that rule on its head by insisting that the District Court was required to decide for itself whether Chevron's claims were arbitrable, before honoring the parties' concededly "clear and unmistakable" agreement to arbitrate that very issue.  Br. 49.  That approach is against all authority and would eviscerate the agreement to grant arbitrators the authority to decide that issue.  Ecuador's suggestion that the UNCITRAL Rules were never "triggered" because Chevron failed to accept Ecuador's offer to arbitrate is demonstrably false.  As the Second Circuit held in a case involving the same treaty and the same parties, "[a]ll that is necessary to form an agreement to arbitrate is for one party to be a BIT signatory and the other to consent to arbitration of an investment dispute in accordance with the Treaty's terms." *Ecuador v. Chevron*, 638 F.3d at 392.  Chevron did exactly that in its notice of arbitration.

B.   The District Court correctly found that the Tribunal's "well reasoned and comprehensive" decision easily survives the highly deferential review required under settled law and would survive "even the more searching form of review Ecuador contends is applicable here." Op. 14–16.  The BIT plainly states that an "investment" includes "a

27

claim to money . . . associated with an investment" and "any right conferred by law or contract," and further provides that an investment continues to exist until it has been wound up. BIT art. I §§ 1(a), 3. In light of that broad protection of investments in all forms, "the Tribunal's reasoning that Chevron's breach-of-contract lawsuits were unexpired 'investments' for purposes of the BIT more than 'holds up under scrutiny.'" Op. 16.

C.  Ecuador's public-policy defense under Article V(2)(b) does not come close to establishing that confirming the Award "would violate our most basic notions of morality and justice." *Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 405 (2d Cir. 2009). Ecuador's argument that the Award is "repugnant" to the policy favoring enforcement of forum-selection clauses is forfeited because it was not raised below and wrong because Ecuador expressly agreed to arbitrate whether Ecuadorian courts provided "effective means" of protection to U.S. investors. BIT art. II § 7. Ecuador's complaint that the Award "usurped the jurisdictional authority of the Ecuadorian judiciary" is wrong for much the same reason. Br. 58. Exercising authority that

28

Ecuador voluntarily delegated to arbitrators can hardly be labeled a "usurpation."

## STANDARD OF REVIEW

This Court's "review of the district court's factual findings in [an] order confirming [an] arbitration award is for clear error, while the court reviews questions of law *de novo*." *LaPrade v. Kidder, Peabody & Co.*, 246 F.3d 702, 706 (D.C. Cir. 2001).

Ecuador misstates the standard of review. *See* Br. 20. The Court reviews "the district court's findings of fact—including facts that bear upon [foreign sovereign] immunity and therefore upon jurisdiction—for clear error." *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 197 (D.C. Cir. 2004). The Court decides *de novo* only "whether those facts are sufficient to divest the foreign sovereign of its immunity." *Id.*

## ARGUMENT

### I. The District Court Correctly Held That The FSIA's Arbitration Exception Denies Ecuador Immunity From This Action.

The FSIA denies immunity from any action to confirm an arbitral award that was "made pursuant to . . . an agreement to arbitrate" entered into by the foreign state "with or for the benefit of a private

party" and that is "governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6). The Tribunal issued the Award pursuant to the BIT, which is an agreement to arbitrate "'made by [Ecuador] . . . for the benefit of a private party.'" Op. 4 (quoting 28 U.S.C. § 1605(a)(6)). And Ecuador concedes that the Award is governed by the New York Convention. Jurisdiction is therefore proper under the plain terms of section 1605(a)(6).

## A.   Pleading A Non-Frivolous Claim Suffices To Invoke The FSIA's Arbitration Exception.

Ecuador incorrectly assumes that the FSIA's arbitration exception lays out "jurisdictional fact[s]" that must be proven. Br. 4. The Supreme Court and this Court recognize two categories of jurisdictional statutes: those that set forth facts that must be proven before jurisdiction will lie, and those that describe the types of claims that the court has the power to hear. The arbitration exception involves the second category, the existence of which Ecuador does not even acknowledge.

This Court's opinion in *Chabad* explains the distinction. Where "jurisdiction depends on particular factual propositions (at least those

30

*independent* of the merits), the plaintiff must, on a challenge by the defendant, present adequate supporting evidence." 528 F.3d at 940. But where "jurisdiction depends on the plaintiff's asserting a particular type of claim, and it has made such a claim, there typically is jurisdiction unless the claim is 'immaterial and made solely for the purpose of obtaining jurisdiction or wholly insubstantial and frivolous.'" *Id.* (alteration omitted) (quoting *Bell*, 327 U.S. at 682–83). This second category is rooted in *Bell*'s familiar principle that "[j]urisdiction . . . is not defeated . . . by the possibility that the [complaint] might fail to state a cause of action on which [plaintiff] could actually recover." 327 U.S. at 682.

*Chabad* illustrates precisely how that dichotomy applies to the FSIA. The plaintiff in *Chabad* invoked the FSIA's expropriation exception, which denies immunity from actions "in which rights in property taken in violation of international law are in issue." 28 U.S.C. § 1605(a)(3). The defendant argued that whether it had *in fact* taken property unlawfully was a "jurisdictional fact that . . . must be resolved definitively before the court could proceed to the merits." *Chabad*, 528 F.3d at 941. This Court disagreed. Joining other courts that apply the

*Bell* standard to the expropriation exception, this Court held that pleading a non-frivolous international-takings claim is all that the FSIA requires. *See id.* at 941–42 (citing additional authorities).[3]

So too here. Like the expropriation exception invoked in *Chabad*, the arbitration exception plainly "depends on the plaintiff's asserting a particular type of claim," not proving factual predicates. 528 F.3d at 940. Section 1605(a)(6) denies immunity from a specific type of claim: an "action . . . brought . . . to confirm an award made pursuant to . . . an agreement to arbitrate" if the "agreement or award is or may be governed by a treaty . . . calling for the recognition and enforcement of arbitral awards." The only jurisdictional prerequisite under section

---

[3] The FSIA's expropriation exception is one of many jurisdictional provisions beyond the federal-question statute to which the *Bell* standard applies. For example, a state-court defendant can invoke removal jurisdiction pursuant to 9 U.S.C. § 205, which covers any action that "relates to an arbitration agreement or award" under the New York Convention, based on nothing more than a non-frivolous claim "that an arbitration clause provides a defense." *Beiser v. Weyler*, 284 F.3d 665, 671–72 (5th Cir. 2002). And a party who requests a stay of an action on the ground that it is "referable to arbitration under an agreement in writing," 9 U.S.C. § 3, can call upon appellate jurisdiction to review an "order . . . refusing a stay of any action under section 3," *id.* § 16(a)(1)(A), even though he is not a party to the arbitration agreement and it is thus uncertain whether he may properly invoke it. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 625, 627–29 (2009).

1605(a)(6) is to plead that type of claim in a manner that is not "wholly insubstantial and frivolous." *Chabad*, 528 F.3d at 940 (quoting *Bell*, 327 U.S. at 682–83); *see also Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657, 659–60 (2d Cir. 2005) (applying *Bell* standard to a Federal Arbitration Act provision conferring "jurisdiction over cases brought to enforce arbitration awards issued under the [New York] Convention," and holding that district courts need not "determine independently whether [defendants] consented to arbitration" because those "are merits questions, not subject matter jurisdiction questions"). Chevron satisfied that standard on the face of its petition to confirm the Award.

Ecuador's brief betrays no awareness of this Court's holding that "plaintiffs must demonstrate certain jurisdictional prerequisites by a preponderance of the evidence before the case goes forward, whereas they can satisfy others simply by presenting substantial and non-frivolous claims." *Chabad*, 528 F.3d at 939. Pointing to neighboring FSIA provisions that require findings of jurisdictional fact, Ecuador argues that the same treatment is warranted for the arbitration exception. *See* Br. 25, 28–29. But that overlooks a crucial distinction between the arbitration exception and the other FSIA provisions upon

33

which Ecuador relies. In the examples that Ecuador cites, the district court's fact-finding is independent of the merits—as when the court inquires whether a foreign state controlled an entity, *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 448–49 (D.C. Cir. 1990), signed a waiver, *Phoenix Consulting*, 216 F.3d at 38–41, or engaged in commercial activity in the United States, *Chabad*, 528 F.3d at 941. By contrast, the arbitrability of the dispute between Chevron and Ecuador is intertwined with the merits of whether the Award should be confirmed. *See TMR Energy Ltd. v. State Prop. Fund of Ukr.*, 411 F.3d 296, 298, 304–05 (D.C. Cir. 2005) (treating arbitrability as a "merits" question in an action invoking section 1605(a)(6)). Indeed, Ecuador describes its own arbitrability argument as going to "the merits of Chevron's petition." Br. 18. Jurisdiction does not depend on how that merits question is answered. *See, e.g.*, *Bell*, 327 U.S. at 685; *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93 (1998).

Unable to offer binding precedent in support of its position, Ecuador looks to the Second and Fifth Circuits. *See* Br. 30–31 (citing *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012 (2d Cir. 1993); *First Inv. Corp. v. Fujian Mawei Shipbuilding, Ltd.*, 703 F.3d 742 (5th

Cir. 2013)).  But Second Circuit precedent actually supports Chevron's position, as *Cargill* suggests and *Sarhank* confirms.  *See Cargill*, 991 F.2d at 1019 ("[T]o determine whether subject matter jurisdiction existed, the district court ought to have determined whether, *if the facts as alleged by CBV are true*, the arbitration agreement . . . was intended to benefit CBV." (emphasis added)); *Sarhank*, 404 F.3d at 659–60 (holding that a district court need not "determine independently whether [the defendant] consented to arbitration" in order to establish jurisdiction to enforce an arbitral award under 9 U.S.C. § 203).  And the Fifth Circuit's decision in *First Investment* does not help Ecuador because the plaintiff there forfeited any section 1605(a)(6) arguments by failing to brief them.  703 F.3d at 756.

Ecuador's charge that the District Court "abdicated its constitutional responsibility" thus rings hollow.  Br. 20.  Everyone agrees that a federal court must "independently assure itself of subject-matter jurisdiction."  *Id.*  Here, however, the court needed to "assure itself" only that Chevron made the "particular type of claim" specified by section 1605(a)(6) and did so in a non-frivolous manner.  *Chabad*,

528 F.3d at 940.  There is no dispute that Chevron met that standard.

Jurisdiction under section 1605(a)(6) is therefore proper.

### B.    The Arbitrability Of Chevron's Claims Is Not A "Jurisdictional Fact."

Even if Ecuador were correct that the arbitration exception sets forth "jurisdictional facts" that must be established, Ecuador's FSIA argument still fails because arbitrability *vel non* is not a fact essential to jurisdiction under section 1605(a)(6).  If that provision requires any facts to be established, it can only be the facts made relevant by its plain terms—*i.e.*, that the award at issue was made pursuant to an agreement to arbitrate and is governed by the New York Convention or a similar treaty.  Those facts are not in genuine dispute here.

### 1.    The FSIA's Arbitration Exception Requires Only That The Award Was Issued Pursuant To The BIT And Is Governed By The New York Convention.

Indulging Ecuador's contention that the FSIA's arbitration exception identifies "jurisdictional facts" that must be established would not save its appeal for a straightforward reason:  The arbitration exception makes no mention of arbitrability.

a.  In general, when jurisdiction under the FSIA depends on particular factual propositions, "the court must go beyond the pleadings

36

and resolve any disputed issues of fact." *Phoenix Consulting*, 216 F.3d at 40. Once the plaintiff makes a *prima facie* showing that an FSIA exception applies, the "burden of persuasion rests with the foreign sovereign claiming immunity, which must establish the absence of the factual basis by a preponderance of the evidence." *Chabad*, 528 F.3d at 940.

Ecuador argues that this jurisdictional framework required the District Court to determine independently whether Chevron's claim constituted an "investment dispute" within the meaning of the BIT. Br. 2, 23–24. Ecuador is wrong because the arbitrability of Chevron's dispute cannot be a fact "the resolution of which is necessary to a ruling" on jurisdiction under the FSIA. *Phoenix Consulting*, 216 F.3d at 40. To the contrary, the only conceivable "jurisdictional facts" necessary to invoke section 1605(a)(6) are those named in the statute: that an "action is brought . . . to confirm an award made pursuant to . . . an agreement to arbitrate" that a foreign state has entered into "with or for the benefit of a private party," and the "agreement or award is or may be governed by" an international agreement calling for enforcement of arbitral awards. As the District Court found, those conditions are

manifestly present here: Ecuador made an "'agreement . . . to submit to arbitration'" by signing the BIT, the Award was issued "'pursuant to'" the BIT, and (as Ecuador concedes, *see* Br. 23) the Award is governed by the New York Convention. Op. 4–6 (quoting 28 U.S.C. § 1605(a)(6)).

b. Ecuador nevertheless urges that the District Court should have resolved two "contested jurisdictional fact[s]": the existence of an agreement to arbitrate and the arbitrability of Chevron's claims under that agreement. Br. 4, 23–24. The trouble with Ecuador's argument is that the first fact is not genuinely contested, and the second is not jurisdictional.

i. Ecuador admits signing the BIT but assumes, without explanation, that the BIT cannot constitute an "agreement to arbitrate" within the meaning of the FSIA. Br. 22–24. Ecuador attempts to sow confusion over the BIT's dual role as, at once, a "standing offer" to arbitrate and a fully consummated arbitration agreement between Ecuador and the United States for the benefit of Ecuadorian and U.S. investors alike. But nothing in the FSIA suggests that only a Chevron-Ecuador agreement can satisfy the arbitration exception. To the contrary, section 1605(a)(6) states (with emphasis added) that an

38

arbitral award need only have been issued pursuant to an "agreement made by the foreign state with *or for the benefit of a private party* to submit to arbitration."   It is therefore clear that the predicate "agreement to arbitrate" under the FSIA need not run between the state and a particular investor, but rather includes arbitration agreements such as investment treaties that are made with another state "for the benefit of" private parties.

The existence of an arbitration agreement by Ecuador is thus uncontested.  Only the legal sufficiency of that fact under the FSIA is contested.  And the District Court *did* independently resolve that issue by determining that the BIT qualifies under section 1605(a)(6) as an arbitration "'agreement made by [Ecuador] . . . for the benefit of a private party'"—namely, U.S. companies such as Chevron.  Op. 4 (quoting 28 U.S.C. § 1605(a)(6)).

That understanding accords with the Tribunal's views on the source of its authority.  As the District Court explained, "the Award's own language indicates [that] it was rendered pursuant to the BIT."  *Id.* The Tribunal stated that the Award was being issued "under the BIT" and described the BIT as one of the "principal relevant legal provisions"

39

in the dispute. Dkt. 22-3, at 39. The Hague district court reached the same conclusion in rejecting Ecuador's attempt to annul the Award. The Dutch court explained that the BIT was the source of the Tribunal's jurisdiction:

> It is not disputed between the parties that Ecuador and the USA agreed in Article VI paragraph 4 of the BIT that they would subject disputes about investments to binding arbitration. In the case in question the competency of the Arbitration Tribunal is *not directly based on an arbitration agreement* that was concluded between Ecuador and Chevron et al., but that agreement is considered to be embodied in the BIT, which both parties have correctly argued.

Dkt. 22-6 ¶ 4.10 (emphasis added). As the Tribunal, the Hague court, and the District Court each recognized, the Award was issued under the authority of the BIT, and the BIT is an agreement to arbitrate that Ecuador does not dispute signing.

ii. That leaves Ecuador's remaining "contested jurisdictional fact": whether Chevron's claims fell within the scope of Ecuador's consent to arbitrate embodied in the BIT. Br. 20, 23–24. But whether Chevron's claims were arbitrable goes to the merits of Chevron's confirmation action, not jurisdiction. *See TMR Energy*, 411 F.3d at 298, 304–05 (noting that argument that tribunal "exceeded the scope of the

40

arbitration agreement" goes to "the merits"). Lacking any authority for its position, Ecuador pins its hopes on the words "pursuant to" in section 1605(a)(6), suggesting that an award is made "pursuant to" an agreement to arbitrate only if the tribunal *correctly* applied that agreement. *See* Br. 22–23. But that phrase cannot bear the meaning Ecuador ascribes to it. "[P]ursuant to" does not mean *correctly* pursuant to, and courts cannot "write words into [a] statute," *Randall v. Sorrell*, 548 U.S. 230, 262 (2006). Ecuador, for example, has raised defenses to confirmation pursuant to the New York Convention. Those defenses are meritless, but as a matter of plain English they nonetheless have been raised pursuant to the Convention rather than pursuant to something else or to nothing.

Ecuador's interpretation is also at odds with the routine construction of similar phrases in jurisdiction-conferring statutes. When a statute authorizes direct review of administrative actions taken "pursuant to" a particular statute, for example, this Court does not first inquire whether the agency action was taken *validly* under the statute before asserting jurisdiction to review the validity of that action. *See Cytori Therapeutics, Inc. v. FDA*, 715 F.3d 922, 925–26 (D.C. Cir. 2013)

41

(asserting jurisdiction under a statute authorizing direct review of orders issued "pursuant to" a provision of the Food, Drug & Cosmetic Act, before turning to determine whether the order was legally valid).[4] It would make no more sense to allow an award debtor to smuggle a merits defense into the jurisdictional inquiry under the FSIA.

Matters get worse for Ecuador when the arbitration exception is read alongside the New York Convention, which predates the exception. The Convention makes it a merits defense to confirmation that an award exceeded the scope of the underlying arbitration agreement. Unlike section 1605(a)(6), which says nothing about arbitrability, the Convention creates a beyond-the-scope defense in plain terms: Recognition "may be refused" when, *inter alia*, an award "contains decisions on matters beyond the scope of the submission to arbitration." N.Y. Conv. art. V(1)(c).   Ecuador's suggestion that Congress meant to

---

[4] *See also Riordan v. SEC*, 627 F.3d 1230, 1232 (D.C. Cir. 2010) (asserting jurisdiction under 15 U.S.C. § 78y(a)(1), which permits direct review of "a final order of the [SEC] entered pursuant to [the Securities Exchange Act]"); *Exportal Ltda. v. United States*, 902 F.2d 45, 49 (D.C. Cir. 1990) (exercising jurisdiction under statute that "expressly provides for direct (and exclusive) review in the court of appeals of every final order issued pursuant to [the Perishable Agricultural Commodities Act] except for reparation orders") (citing 28 U.S.C. § 2342(2)).

duplicate this inquiry in the FSIA's arbitration exception is beyond implausible. Section 1605(a)(6) and the Convention were meant to work harmoniously together. *Creighton*, 181 F.3d at 123–24 ("[T]he New York Convention 'is exactly the sort of treaty Congress intended to include in the arbitration exception.'" (citation omitted)). There is no reason to believe that Congress, through the innocuous phrase "pursuant to," intended to require courts to evaluate the scope of an arbitration agreement twice in the same case—and frequently under different standards of review, as would happen whenever the parties delegate that question to the arbitrators. *See First Options*, 514 U.S. at 943. To the contrary, as illustrated by Article V(1)(c) of the New York Convention and 9 U.S.C. § 207, when Congress intends courts to examine arbitrability it uses words plainly adapted to that purpose.

> **2.    The Chevron-Ecuador Agreement Is An Equally Valid Basis For Invoking The FSIA Arbitration Exception.**

Even accepting Ecuador's unsupported view that only an Ecuador-Chevron arbitration agreement (and not the BIT) can satisfy the FSIA's arbitration exception, the result is the same. The District Court independently determined that a Chevron-Ecuador agreement to

43

arbitrate exists, *see* Op. 11–13, and that finding of fact is far from clearly erroneous, *see Price*, 389 F.3d at 197.

In *Ecuador v. Chevron*, 638 F.3d 384, the Second Circuit explained how an arbitration agreement is formed under the BIT. Under the plain terms of the BIT, a U.S. "company" can accept Ecuador's standing offer to arbitrate "any investment dispute" simply by "consent[ing] in writing to the submission of the dispute for settlement by binding arbitration." BIT art. VI § 3(a); *Chevron*, 638 F.3d at 393. At that point, "an 'agreement in writing' for purposes of Article II of the [New York] Convention" is formed. *Chevron*, 638 F.3d at 392–93 (citing BIT art. VI § 4(b)). Therefore, as the Second Circuit held, "[a]ll that is necessary to form an agreement to arbitrate is for one party to be a BIT signatory and the other to consent to arbitration of an investment dispute in accordance with the Treaty's terms." *Id.* at 392.

Applying that framework, the District Court independently determined that Ecuador and Chevron formed an arbitration agreement. *See* Op. 12. Ecuador signed the BIT in 1993. Chevron submitted its notice of arbitration in December 2006, expressly accepting Ecuador's "consent[] to the submission of any investment

44

dispute for settlement by binding arbitration." Dkt. 22-2, at 10. At that point, the arbitration agreement was formed.

Ecuador conceded this point below and disclaimed any intention to challenge the Award under New York Convention Article V(1)(a), the provision permitting defense on the ground that no valid arbitration agreement was formed. As Ecuador correctly explained:

> Article V(1)(a)[ ] covers situations where no valid arbitration agreement exists at all. Here, however, the issue is whether a particular dispute falls within an existing arbitration agreement, making Article V(1)(c) the applicable provision.

Dkt. 18, at 24 n.1.

On appeal, Ecuador contradicts itself. The crux of Ecuador's argument now is that no Chevron-Ecuador agreement was formed because there was a lack of mutuality. Br. 23–24. Ecuador says that it consented to arbitrate only "investment disputes," but Chevron sought to arbitrate a non-investment dispute—issuing a "counteroffer" that Ecuador never accepted. *Id.* This is pure fiction. It is evident from the face of Chevron's notice of arbitration that Chevron accepted Ecuador's standing offer to arbitrate. Dkt. 22-2, at 10 (describing the "Agreement to Arbitrate" authorized by BIT art. IV). That the parties *disagreed* about the proper interpretation of the BIT does not mean that

45

Chevron's notice of arbitration "purport[ed] to modify th[e] terms" of the BIT.  Br. 23.

Ecuador accuses the District Court and the Second Circuit of "effectively read[ing] key terms out of the Treaty" by adopting a "categorical rule finding consent to arbitrate absent conclusive proof of an 'investment dispute.'"  *Id.* at 33.  But it is Ecuador that has read key terms out of the BIT: the definition of "investment dispute," and the provision authorizing arbitrators to determine whether Chevron's claims constitute investment disputes within the scope of the BIT.

Ecuador does not even mention the definition of the term that is central to its lack-of-mutuality argument.  The BIT defines "investment dispute" to include "an *alleged* [breach] of any right conferred or created by this Treaty with respect to an investment."  BIT art. VI § 1 (emphasis added).  As the District Court explained, this definition confirms that, to form an arbitration agreement, Chevron needed only to show that it is a U.S. company and that it has *alleged* a breach of Ecuador's BIT obligations with respect to an investment.  Op. 12.  Chevron did that in its notice of arbitration by alleging, *inter alia*, that Ecuador "failed to provide full protection and security to [Chevron's

46

investments" and "failed to provide effective means of asserting claims and enforcing rights" as required by the BIT. *See* Dkt. 22-2, at 2. Whether Chevron would prevail in proving the alleged BIT breaches was unknown at the time, but it is clear that Chevron "properly requested arbitration of an 'alleged breach of [a] right conferred by [the BIT] with respect to an investment.'" Op. 12 (quoting BIT art. VI § 1). Nothing more was necessary to form an agreement to arbitrate that dispute.

Ecuador's lack-of-mutuality argument reads a second key provision of out of the BIT: the signatories' consent to arbitrate "investment disputes" *as interpreted by the arbitrators*. The BIT states that any arbitration will be governed by the UNCITRAL Rules if the investor so elects. BIT art. VI § 3(a)(iii). Chevron accepted that term of Ecuador's offer in its notice of arbitration. Dkt. 22-2, at 1 ("[Chevron and TexPet] hereby serve notice of the institution of an arbitration proceeding under the UNCITRAL Arbitration Rules against the Republic of Ecuador."). Ecuador concedes that the parties' adoption of the UNCITRAL Rules is "clear and unmistakable evidence" that they intended the arbitrators to determine whether a given dispute fell

47

within the scope of the BIT, Br. 49—a concession to settled law, *see* Part II.A.1, *infra*.

In light of that term of Ecuador's offer, the notion that "Chevron's notice of arbitration constituted a counteroffer to arbitrate under new terms" is legally untenable as well as factually false.  Br. 24.  In substance, Ecuador's offer stated:  We will arbitrate "any investment dispute" covered by the BIT, as interpreted and applied by the arbitral tribunal in accordance with the UNCITRAL Rules.  BIT art. VI §§ 4, § 3(a)(iii).  Chevron's notice of arbitration said: We accept.  There was perfect symmetry between the offer and acceptance, and the parties' agreement to arbitrate was complete.

Ecuador's attempt to recast a dispute over the arbitration agreement's *scope* as a dispute over its *existence* is also contrary to the Second Circuit's decision in *Schneider v. Kingdom of Thailand*, 688 F.3d 68, 73–74 (2d Cir. 2012).  In that case, Thailand resisted confirmation of an award issued under a similar bilateral investment treaty that also incorporated the UNCITRAL Rules.  *Id.* at 70.  Like Ecuador, Thailand argued that the award was invalid because the investor's claims did not concern "investments" covered by the treaty and, hence, no agreement

48

to arbitrate was formed. The Second Circuit saw through that argument, holding that it was "beyond dispute" that "Thailand, by signing the [treaty], and [the investor], by consenting to arbitration, have created a separate binding agreement to arbitrate." *Id.* at 71–72 (citation omitted). Whether the investor's claims involved "approved investments" went to the "scope of [the] arbitration agreement rather than its formation." *Id.* at 72. The same is true here. The question whether Chevron's lawsuits were covered "investments" goes to the proper interpretation of the BIT's terms and has nothing to do with whether Chevron and Ecuador formed an agreement to arbitrate.

Ecuador attempts to distinguish *Schneider* and *Chevron* on the ground that neither involved a dispute over the FSIA's arbitration exception. Br. 31. But the relevance is obvious: *Chevron* explains how an arbitration agreement is formed under the BIT, and *Schneider* rejects Ecuador's central FSIA argument that determining whether an arbitration agreement was *formed* requires determining whether the particular claims submitted for arbitration pursuant to that agreement were, in fact, properly *arbitrable*.

49

Ecuador complains that *Schneider* "did not even involve the same treaty," but it identifies no material difference because there is none. Br. 32–33. The Germany-Thailand BIT in *Schneider* incorporated the UNCITRAL Rules and prescribed the same procedure for forming an arbitration agreement: The signatories offered to arbitrate "[d]isputes concerning investments," and an investor could accept that offer by requesting that a dispute be submitted for arbitration. *See* Treaty Concerning the Encouragement and Reciprocal Protection of Investments, Ger.-Thai., 2286 U.N.T.S. 159, art. X (June 24, 2002). The Second Circuit held that Thailand (like Ecuador) offered to arbitrate whether a submitted dispute concerns an "investment" within the scope of the treaty. *Schneider*, 688 F.3d at 72–73 (holding that by incorporating the UNCITRAL Rules, the parties agreed "to arbitrate issues of arbitrability, including whether the tollway project involved 'approved investments'"). And the plaintiff in *Schneider*, like Chevron, accepted that offer by requesting arbitration.

Unable to distinguish *Chevron* and *Schneider*, Ecuador suggests that those cases were wrongly decided because an investor cannot coerce a foreign sovereign to arbitrate a dispute by merely "demanding"

it.  Br. 32.  But of course that is not what the Second Circuit or the District Court held.  The "demand" (a notice of arbitration) must accept a standing offer to arbitrate by the foreign sovereign.  And the demand does not lead to an award on the merits unless the arbitral tribunal determines that the submitted claims fall within the scope of the treaty.

*    *    *

The FSIA does not entitle Ecuador to "two bites at the apple of the merits of its dispute with Chevron."  Op. 6.  It is enough that Chevron pleaded the "particular type of claim" for which the arbitration exception denies immunity.  *Chabad*, 528 F.3d at 940.  And even if Ecuador were correct that the arbitration exception requires proof of "jurisdictional facts," the only facts that are conceivably "jurisdictional" are beyond dispute here:  Ecuador entered into an agreement to arbitrate with or for the benefit of private parties, and the Award was made pursuant to that agreement.  Nothing in section 1605(a)(6) makes subject-matter jurisdiction turn on whether the Tribunal correctly interpreted the BIT's scope in finding Chevron's claims arbitrable.[5]

---

[5] Ecuador's demand for *de novo* review of the Tribunal's arbitrability determination fails for the additional reason that there is nothing

Ecuador's demand to relitigate arbitrability contravenes both the text of the FSIA and the "emphatic federal policy in favor of arbitral dispute resolution." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985).

## II.    The District Court Correctly Held That There Is No Basis To Deny Confirmation Under The New York Convention.

The Federal Arbitration Act "affords the district court little discretion" to decline to enforce a foreign arbitral award, *Belize Social Dev. Ltd. v. Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012), providing instead for "summary confirmation" of such awards, *Comm'ns Imp. Exp. S.A. v. Republic of the Congo*, No. 13-7004, 2014 WL 3377337, at *10 (D.C. Cir. July 11, 2014). *See* 9 U.S.C. § 207. A court "may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention." *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007) (internal quotation marks omitted). The

---

improper about deferring to a non-Article III fact-finder—even regarding facts that genuinely do go to jurisdiction. *See, e.g., Foremost-McKesson*, 905 F.2d at 450 (relying on the work of an arbitral tribunal to determine whether the commercial-activity exception in section 1605(a)(2) was satisfied); *Orlando Residence, Ltd. v. GP Credit Co.*, 553 F.3d 550, 556 (7th Cir. 2009) (observing, with numerous citations, that if a state court "resolves a jurisdictional issue in a full and fair hearing, that resolution is entitled to the same collateral estoppel effect that a ruling on a substantive issue would be entitled to").

Convention "assigns the burden of persuasion to the party opposing enforcement." *TMR Energy*, 411 F.3d at 304.

The District Court correctly held that Ecuador failed to establish any defense against recognition.  Ecuador's Article V(1)(c) beyond-the-scope defense is foreclosed by the Tribunal's arbitrability ruling, which "more than 'holds up under scrutiny.'"  Op. 16.  And Ecuador's Article V(2)(b) public-policy defense does not come close to establishing that the Award is "repugnant to fundamental notions of what is decent and just." *Tahan v. Hodgson*, 662 F.2d 862, 864 (D.C. Cir. 1981).

## A.    The Tribunal's Arbitrability Ruling Forecloses Ecuador's Beyond-The-Scope Defense.

The BIT's incorporation of UNCITRAL Rules constitutes "clear[] and unmistakabl[e]" evidence that the parties agreed to arbitrate questions of arbitrability.  Op. 13.  Ecuador concedes as much.  Br. 49; Dkt. 26, at 6.  The District Court therefore properly deferred to the Tribunal's considered judgment that Chevron's claims fell within the terms of Ecuador's submission to arbitration.

53

1.  **Because The Parties Agreed To Arbitrate Questions Of Arbitrability, Deference To The Tribunal's Decision Is Required.**

The presumption that courts should resolve questions of arbitrability is overcome by "clear and unmistakable evidence" that the parties delegated that power to the arbitrator. *First Options*, 514 U.S. at 943. When an arbitration agreement "explicitly incorporate[s] rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir. 2005). "Virtually all . . . leading institutional arbitration rules" delegate to arbitrators the power to resolve all questions of arbitrability. 1 GARY B. BORN, INTERNATIONAL COMMERCIAL ARBITRATION 933 (2009) ("BORN").

It is common ground here that, by incorporating the UNCITRAL Rules, the BIT authorizes the arbitrators to resolve questions of arbitrability—including the scope, existence, and validity of the parties' agreement to arbitrate. UNCITRAL Rules, art. 21 ¶ 1 (directing that the arbitral tribunal "shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the

54

existence or validity of the . . . arbitration agreement."). Every court to address the issue has reached the same conclusion: The incorporation of the UNCITRAL Rules provides "clear and unmistakable evidence" that the parties intended the arbitrator to decide all questions of arbitrability. *See, e.g.*, *Schneider*, 688 F.3d at 73–74; *Chevron*, 638 F.3d at 394; *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1073 (9th Cir. 2013); *Grynberg v. BP P.L.C.*, 596 F. Supp. 2d 74, 79 (D.D.C. 2009).

The District Court thus correctly understood that, to give effect to the parties' intentions, it could not substitute its *de novo* judgment on questions of arbitrability for the Tribunal's considered decision. *See First Options*, 514 U.S. at 943 (holding that "a court must defer to an arbitrator's arbitrability decision when the parties submitted that matter to arbitration").

Despite conceding that adoption of the UNCITRAL Rules constitutes "clear and unmistakable evidence" of an agreement to arbitrate arbitrability, Ecuador insists that this evidence is "not dispositive"—but it cannot make up its mind why. Br. 49; Dkt. 26, at 6. Ecuador argued below that an agreement to arbitrate arbitrability commands deference under *First Options* only at the pre-award stage,

55

not at the award-enforcement stage.  Dkt. 26, at 6–7.  There is no authority for that distinction—indeed, *First Options* itself was an award-enforcement case—and Ecuador has abandoned that argument on appeal.

Now Ecuador says that the UNCITRAL Rules did not "come into play" because no agreement to arbitrate was ever formed.  Br. 48–49.  As in its FSIA argument, Ecuador strains to recast a dispute over the arbitration agreement's scope as a dispute about its existence.  It would not help Ecuador even if the issue could be reframed in this way, and in any event, it cannot be.

As an initial matter, Ecuador's attack on the existence of an arbitration agreement cannot, as a matter of law, support its Article V(1)(c) defense.  "Article V(1)(c) does *not* apply where there is a dispute as to the existence of a valid arbitration agreement," but rather concerns the "scope of a concededly existent and valid arbitration agreement."  BORN 2798–99 (emphasis in original).  The only ground under the New York Convention for challenging the *existence* of an arbitration agreement is Article V(1)(a)—a defense that Ecuador not only failed to raise, but expressly disclaimed.  *See* Dkt. 18, at 24 n.1

56

("Article V(1)(a)[ ] covers situations where no valid arbitration agreement exists at all. Here, however, the issue is whether a particular dispute falls within an existing arbitration agreement, making Article V(1)(c) the applicable provision."). Ecuador's effort to pass off its challenge to the Tribunal's interpretation of the BIT as a challenge to the existence of an arbitration agreement therefore does not advance its Article V(1)(c) defense, and Ecuador has waived any Article V(1)(a) defense. *See Artis v. Bernanke*, 630 F.3d 1031, 1038 (D.C. Cir. 2011).

Ecuador's strained challenge to the existence of an arbitration agreement also goes nowhere because, under the UNCITRAL Rules, disputes concerning the existence of an arbitration agreement between an investor and an investment treaty signatory—no less than disputes concerning the scope of the agreement—are for the arbitrators to resolve. *See Chevron*, 638 F.3d at 394 (holding that Ecuador's defense against arbitration, even if viewed as "undermining the agreement itself," was for the tribunal to resolve); UNCITRAL Rules, art. 21 (providing that the tribunal "shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the

57

*existence or validity* of the . . . arbitration agreement" (emphasis added)); *see also Contec Corp.*, 398 F.3d at 208 (requiring arbitration of dispute over validity of arbitration agreement where the agreement included delegation provision substantively identical to Article 21 of UNCITRAL Rules).

In any event, as explained in Part I.B.2, *supra*, Ecuador's "existence" argument fails on its own terms.   In signing the BIT, Ecuador consented to arbitrate "any investment dispute," with that term to be interpreted by the Tribunal as per the UNCITRAL Rules. BIT art. VI §§ 1, 3.   Chevron's notice of arbitration "complete[d] the 'agreement in writing' to submit the dispute to arbitration." *Chevron*, 638 F.3d at 392–93 (quoting N.Y. Conv. art. II).   And as the Second Circuit held in *Schneider*, an award debtor cannot disavow its agreement to arbitrate questions of arbitrability by recasting a dispute over the scope of covered "investments" as a dispute over the existence of the arbitration agreement itself.   688 F.3d at 71–72.

Ecuador's argument reduces to this self-refuting proposition:   The District Court was required to decide for itself whether Chevron's claims were arbitrable, before giving effect to the parties' concededly

"clear and unmistakable" agreement to have the Tribunal decide that question. Br. 32–34. That approach would "frustrate the basic purpose of arbitration, which is to dispose of disputes quickly and avoid the expense and delay of extended court proceedings, and would make an award the commencement, not the end, of litigation." *Schneider*, 688 F.3d at 73 (citation omitted).

It is no wonder, then, that Ecuador has mustered no authority for its position. Ecuador selectively quotes *VRG Linhas Aereas S.A. v. MatlinPatterson Global Opportunities Partners II L.P.*, 717 F.3d 322 (2d Cir. 2013), in which the Second Circuit distinguished genuine disputes over whether there is "any arbitration agreement *at all*" from disputes over the scope of an admittedly existing arbitration agreement. *Id.* at 325 n.2 (emphasis added). This case plainly falls in the second category. It is certainly true that "absent any valid agreement to arbitrate *at all*, there can be no agreement to arbitrate jurisdictional issues." BORN 940 (emphasis added); *see, e.g.*, *China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.*, 334 F.3d 274, 279 (3d Cir. 2003) (noting allegation that a purported arbitration agreement was forged). "Here, however, the issue is whether a particular dispute falls

within an existing arbitration agreement"—as Ecuador correctly put it below. Dkt. 18, at 24 n.1. Ecuador does not contend that the BIT is a forgery, and whether Chevron's notice of arbitration validly accepted Ecuador's standing offer and formed a separate arbitration agreement was a question for the Tribunal given the BIT's adoption of the UNCITRAL Rules.

Finally, Ecuador's reliance on this Court's reversed decision in *BG Group* makes no sense. Br. 49–50. The *BG Group* panel held that the UNCITRAL Rules are not "triggered" until the investor complies with a procedural precondition to arbitration and thus that a court should decide *de novo* whether that precondition was satisfied. 665 F.3d at 1370–71. The Supreme Court reversed, holding that it was for arbitrators to decide whether the precondition was satisfied.

Even before it was reversed, this Court's decision did not help Ecuador. The *BG Group* panel never doubted that, once an arbitration clause is invoked, questions of substantive arbitrability are governed by the parties' "clear[] and unmistakabl[e]" delegation of authority to the tribunal under the UNCITRAL Rules. *Id.* at 1371. And there is no genuine dispute here concerning compliance with any precondition to

60

arbitration:  The only step necessary to "trigger" the UNCITRAL Rules was Chevron's submission of a notice of arbitration accepting Ecuador's offer to arbitrate under the BIT.  *Chevron*, 638 F.3d at 395; *Schneider*, 688 F.3d at 72–73.  That "condition" was satisfied.  This Court should reject Ecuador's invitation to not only revive but dramatically extend the reversed holding of *BG Group* to issues of substantive arbitrability.

## 2. The Tribunal Properly Determined That It Had Jurisdiction.

The Supreme Court has held that where, as here, the parties have "agreed to submit the arbitrability [question] itself to arbitration . . . the court's standard for reviewing the arbitrator's decision about that matter should not differ from the standard courts apply when they review any other matter that parties have agreed to arbitrate."  *First Options*, 514 U.S. at 943.  That standard is highly deferential.  Arbitrators cannot simply ignore the law and "dispense their own brand of justice."  *BG Group*, 134 S. Ct. at 1213 (quotations marks and alterations omitted).  But "'as long as an honest arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'"  *E. Associated*

61

*Coal Corp. v. United Mine Workers of Am.*, 531 U.S. 57, 61–62 (2000) (citation and alterations omitted). The District Court correctly held that the Tribunal's arbitrability analysis easily survives deferential review and indeed would be "sufficient to survive even the more searching form of review [that] Ecuador contends is applicable here." Op. 16.

The integrity and diligence of the Tribunal is not in dispute. Ecuador had every opportunity to press its beyond-the-scope defense. The Tribunal held four days of hearings on the arbitrability of Chevron's claims, and its deliberations culminated in a thorough, carefully reasoned, 140-page opinion devoted to that question—joined by all three arbitrators, including Ecuador's appointee.

The Tribunal correctly concluded that Chevron's lawsuits arising out of the Investment Agreement fell within the scope of the BIT. The BIT begins by defining the term "investment" broadly to mean "every kind of investment." BIT art. I § 1(a). It then sets forth a "nonexhaustive, illustrative list of interests . . . included in the term investment." KENNETH J. VANDEVELDE, U.S. INVESTMENT TREATIES: POLICY AND PRACTICE 45 (1992) (Dkt. 21-1).

Article I defines "investment" to include not only tangible, brick-and-mortar investments, but also "a claim to money or a claim to performance having economic value, and associated with an investment" and "any right conferred by law or contract."  BIT art. I § 1(a)(iii), (v). The BIT's protection applies equally to investments launched before ratification and to new investments.  *See id.* XII § 1. And to protect the full lifecycle of an investment, the BIT provides that "[a]ny alteration of the form in which assets are invested or reinvested shall not affect their character as [an] investment."  *id.* I § 3.

Based on these provisions, the Tribunal reasoned that Chevron's lawsuits "concern the liquidation and settlement of claims relating to [Chevron's initial investment in Ecuador] and, therefore, form part of that investment."  Dkt. 22-3 ¶ 180.  Article I § 3 supported the Tribunal's conclusion that "[o]nce an investment is established, it continues to exist and be protected [by the BIT] until its ultimate 'disposal' has been completed—that is, until it has been wound up."  *Id.* ¶ 183.  And the non-exhaustive list of forms that an investment may take signaled that the BIT was intended to protect an investment in all of its phases.  *Id.* (citing BIT art. I § 1(a)).  On that basis, the Tribunal

63

concluded that Chevron's "investments have not ceased to exist: [Its] lawsuits continued [its] original investment." *Id.* ¶ 184.

The Tribunal's decision is in accord with other tribunals' broad constructions of the term "investment" in bilateral investment treaties. *See, e.g.*, *SGS Société Générale de Surveillance S.A. v. Republic of the Philippines*, ICSID Case No. ARB/01/6, Decision of the Tribunal on Objections to Jurisdiction ¶¶ 32, 99–103 (Jan. 29, 2004) (concluding that claims to payment under a contract constituted an investment) (Dkt. 21-5); *Fedax NV v. Venezuela*, ICSID Case No. ARB/96/3, Decision of the Tribunal on Objections to Jurisdiction ¶¶ 32 *et seq.* (July 11, 1997) (concluding that purchase of promissory notes constituted an investment) (Dkt. 21-4). And contrary to Ecuador's suggestion (Br. 38), the tribunal in *Occidental Exploration v. Republic of Ecuador*, LCIA Case No. UN 3467 (July 1, 2004), *did* exercise jurisdiction over BIT claims related to an investor's tax refund; it declined jurisdiction only over an expropriation claim related to the refund. *Id.* ¶¶ 73–75.[6]

─────────────────

[6] Ecuador's reliance on *GEA Group Aktiengesellschaft v. Ukraine*, ICSID Case No. ARB/08/16, Award (Mar. 31, 2011), is also misplaced. Applying a treaty that defines "investment" more narrowly than the BIT, *id.* ¶ 138, the *GEA* tribunal rejected the argument that an arbitral

Ecuador argues that Chevron's lawsuits were not "associated with an investment" because the Chevron investment that began with the Investment Agreement "expired" in 1992 and was not "ongoing" when the BIT took effect in 1997. Br. 52. But that argument assumes its own conclusion. As the Tribunal explained, the BIT protects the full lifespan of an investment, including "claim[s] to money" arising out of the investment. Consequently, the relevant "investment" is the continuum of Chevron's involvement in Ecuador that began with the Investment Agreement and continued through Chevron's attempts to obtain a remedy, in Ecuadorian courts, for Ecuador's breaches of that agreement. In 1997 and thereafter, Chevron continued to hold the contractual right, under the Investment Agreement, to more than $700 million in payments from PetroEcuador. The fact that those rights took the form of "claim[s] to money" in still-pending court actions—rather than unpaid invoices in PetroEcuador's accounts-payable department— does not divest them of their character as part of Chevron's investment.

---

award *itself*—as well as two agreements that "merely established an inventory of undelivered goods," "recorded the difference as a debt," and "established a means for the repayment"—constituted protected investments. *Id*. ¶ 156. That argument has nothing in common with Chevron's claims.

Nor can Ecuador coherently explain why Chevron's breach-of-contract claims did not secure "right[s] conferred by law or contract"—another kind of protected "investment."   BIT art. I § 1(a)(iii), (v). Ecuador argues that the Tribunal's reliance on those terms "impermissibly rendered superfluous" the BIT's reference to lawsuits "associated with an investment."  Br. 45.  But the BIT does not slice matters so finely.  Article I's "broad definitions, accompanied by these non-exhaustive lists, seek generally to make the scope of application of the BIT as large as possible."   Wolfgang Kühn, *Practical Problems Related to BITs in International Arbitration*, in INVESTMENT TREATIES & ARBITRATION 43, 50 (2002) (Dkt. 21-2).   The definition of investment begins with catch-all terms ("every kind of investment") that are illustrated by examples, not partitioned into mutually exclusive categories.    And because the aim was not precision but rather comprehensiveness, the examples overlap in several instances.  *See* BIT art. I § 1(a) (listing "intangible property" separately from "literary and artistic works" and "mortgages" separately from "right[s] conferred by . . . contract").  The fact that "a claim to money . . . associated with an investment" overlaps with "right[s] conferred by law or contract" is no

reason to ignore the ordinary meaning of either phrase, and both clearly encompass Chevron's lawsuits.

Ecuador's assertion that the 1995 settlement extinguished "any rights [Chevron] had with respect to its oil-related investment" is demonstrably false. Br. 37. As the Tribunal noted, the settlement expressly "excluded . . . all pending claims which 'exist[ed] judicially between the parties,' which included TexPet's seven court cases," Dkt. 22-4 ¶ 138—lawsuits that Ecuador concedes "arose from [Chevron's] investment activity," Br. 40. Those valid "claim[s] to money . . . associated with an investment," BIT art. I § 1(a)(iii), were ongoing when the BIT took effect and, consequently, fall easily within the scope of arbitrable disputes.

Ecuador's last refuge is the rule against retroactivity, which it distorts into an absolute bar against liability for *post*-ratification violations that "arose from" pre-ratification activity. Br. 40. But that is not the law. A tribunal may exercise jurisdiction over disputes that arose before a treaty entered into force, as long as the breaching conduct did not "cease to exist" before the treaty took effect. Vienna Convention on the Law of Treaties, 1155 U.N.T.S. 331, art. 28 (May 23,

1969).  As the International Law Commission of the United Nations has

explained:

> If . . . an act or fact or situation which took place or arose
> prior to the entry into force of a treaty continues to occur or
> exist after the treaty has come into force, it will be caught by
> the provisions of the treaty.  The non-retroactivity principle
> cannot be infringed by applying a treaty to matters that
> occur or exist when the treaty is in force, even if they first
> began at an earlier date.

*Draft Articles on the Law of Treaties with Commentaries* 211–12, Rept.

of the International Law Commission to the General Assembly (1966).[7]

Accordingly, tribunals routinely consider pre-ratification conduct

in evaluating an alleged treaty violation that was ongoing when the

treaty took effect.  In *Mondev International Ltd. v. United States*, for

example, the tribunal held that "events or conduct prior to the entry

into force of [a treaty] may be relevant in determining whether the

State has subsequently committed a breach of the [treaty]" and

exercised jurisdiction over a dispute arising from active lawsuits filed

before ratification.  NAFTA Case No. ARB(AF)/99/2, Award ¶ 70 (Oct.

11, 2002) (Dkt. 21-9).  Contrary to Ecuador's attempt to distinguish

*Mondev*, the Ecuadorian judiciary's undue delay of Chevron's lawsuits

---

[7] *Available at* http://legal.un.org/ilc/texts/instruments/english/commentaries/1_1_1966.pdf.

was precisely the kind of "act of a continuing character" that falls within the BIT's temporal scope. *Id.* ¶ 58; *see also Tecnicas Medioambientales Tecmed SA v. Mexico*, ICSID Case No. ARB(AF)/00/02, Award ¶ 68 (May 29, 2003) (Dkt. 21-12) (concluding that "conduct, acts or omissions of [Mexico] which, though they happened before the entry into force, may be considered a constituting part, concurrent factor or aggravating or mitigating element of conduct or acts or omissions of [Mexico] which took place after such date do fall within the scope of this Arbitral Tribunal's jurisdiction"); *Feldman v. Mexico*, ICSID Case No. ARB(AF)/99/1, Interim Decision ¶ 62 (Dec. 6, 2000) (Dkt. 21-13) (concluding that "if there has been a permanent course of action by Respondent which started before [NAFTA's entrance date] and went on after that date and which, therefore, 'became breaches' of NAFTA . . . on that date . . . that [post-treaty] part of Respondent's alleged activity is subject to the Tribunal's jurisdiction").[8]

---

[8] The tribunal in *MCI Power Group L.C. v. Republic of Ecuador*, ICSID Case No. ARB/03/6, Award (July 31, 2007) (Dkt. 19-16), did not hold otherwise. Contrary to Ecuador's contention, the tribunal held that it *did* have jurisdiction over an investor's breach-of-contract claims concerning the liquidation of an investment launched under a contract that Ecuador had terminated before the BIT took effect. *Id.* ¶¶ 202,

The one U.S. case addressing retroactivity that Ecuador cites, *Ehrlich v. American Airlines*, 360 F.3d 366 (2d Cir. 2004), only illustrates why Chevron's claims are not retroactive.  In *Ehrlich*, the Second Circuit applied the anti-retroactivity principle to bar application of a 2003 treaty to airline passengers' claims based on injuries sustained in a 1999 crash.  Because the event giving rise to the plaintiffs' claims (the crash) occurred years before ratification, the treaty did not apply.  *Id.* at 373.  By contrast, Chevron's lawsuits, and the Ecuadorian judiciary's denial of effective means to vindicate the rights asserted through those lawsuits, extended years after ratification.

The District Court correctly concluded that there is no basis to disturb the Tribunal's arbitrability decision—particularly under the highly deferential standard that controls in this case.

---

226–30.  The tribunal explained that the connection between the investor's claims and any pre-ratification investment activity, far from tainting the claims as retroactive, could serve as evidence of "the background, the causes, or scope of violations of the BIT that occurred after its entry into force."  *Id.* ¶ 93.

### B.    The Award Is Not Contrary To Public Policy.

The public-policy defense under Article V(2)(b) of the New York Convention "must be construed very narrowly to encompass only those circumstances where enforcement would violate our most basic notions of morality and justice." *Telenor Mobile*, 584 F.3d at 405 (internal quotation marks omitted).   On appeal, Ecuador argues that public policy precludes enforcement for two reasons.  Both are meritless.

Ecuador first argues that the Award is "repugnant" to the policy favoring enforcement of forum-selection clauses.   Br. 56.   That argument has been forfeited because Ecuador never mentioned it to support its public-policy defense below, Dkt. 18, at 23–26; Dkt. 26, at 15–17.  *See Potter v. District of Columbia*, 558 F.3d 542, 547 (D.C. Cir. 2009).   In any event, the argument is baseless.  In the BIT, Ecuador expressly agreed to arbitrate whether Ecuadorian courts provided "effective means" of protection to U.S. investors, and that provision did not exempt cases in which U.S. investors had previously agreed to litigate in local courts.   BIT art. II § 7.   Nor did the 1995 settlement obligate Chevron to litigate only in Ecuador's courts as Ecuador suggests.   Far from "expressly" agreeing that its "lawsuits would be

71

resolved by Ecuadorian courts" (Br. 41), Chevron simply reasserted its right to pursue its claims "before the authorities having the appropriate jurisdiction," Dkt. 19-11 § 4.6 — without specifying the limitation that Ecuador misleadingly adds. Br. 7 ("*i.e.*, the Ecuadorian courts"). Under the BIT, the Tribunal is one such authority.

Ecuador's complaint that the Award "usurped the jurisdictional authority of the Ecuadorian judiciary" also fails. Br. 58. As the District Court explained, Ecuador and the United States agreed to arbitrate claims that their respective judiciaries had failed to provide "effective means of asserting claims and enforcing rights" held by investors. BIT art. II § 7. "In this sense, the BIT[] . . . operates as a backstop against the failure of the court systems of either of the signatory nations, and it has played that role appropriately here." Op. 19. The Tribunal's exercise of a power that Ecuador *voluntarily* delegated to it can hardly be labeled a "usurpation."

Ecuador's principal authority, *Medellín v. Texas*, 552 U.S. 491 (2008), is irrelevant. *Medellín* declined to enforce an International Court of Justice judgment because the treaty authorizing that tribunal was not "self-executing" and, as a result, its judgment could not be

directly enforced without U.S. implementing legislation. *Id.* at 512–13. Here, by contrast, a federal statute (the Federal Arbitration Act) not only authorizes but compels the recognition of awards issued under the New York Convention. 9 U.S.C. § 207.

**CONCLUSION**

The judgment of the District Court should be affirmed.

Respectfully submitted.

 */s/ Jeffery S. Bucholtz*
Jeffrey S. Bucholtz
Brian Callanan
James P. Sullivan
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone:  (202) 737-0500
Facsimile:  (202) 626-3737
jbucholtz@kslaw.com

Brian A. White
KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309
Telephone:  (404) 572-4739
Facsimile:  (404) 572-5100

Caline Mouawad
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 556-2172
Facsimile:  (212) 556-2222

*Counsel for Appellees*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure and Circuit Rule 32(a)(2), I hereby certify that the textual portion of the foregoing brief (exclusive of the disclosure statement, tables of contents and authorities, certificates of service and compliance, but including footnotes) contains 13,974 words as determined by the word-counting feature of Microsoft Word 2010.

 */s/ Jeffrey S. Bucholtz*
Jeffrey S. Bucholtz

**CERTIFICATE OF SERVICE**

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that I have this 18th day of July 2014, served a copy of the foregoing Brief of Appellees electronically through the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.


 */s/ Jeffrey S. Bucholtz*

Jeffrey S. Bucholtz

# ADDENDUM

# TABLE OF CONTENTS

9 U.S.C. § 203 ....................................................................... Add-1

9 U.S.C. § 207 ....................................................................... Add-1

28 U.S.C. § 1605(a)(6)......................................................... Add-2

New York Convention,
    21 U.S.T. 2517, 330 U.N.T.S. 3 (June 10, 1958) (excerpts) ........ Add-3

U.S-Ecuador BIT,
    Aug. 27, 1993, S. Treaty Doc. 103-15
    (entered into force May 11, 1997) (excerpts) .............................. Add-5

*Republic of Ecuador v. Chevron Corp. & Texaco Petroleum Co.*,
    No. 200.112.516/01 (Hague Ct. App. June 18, 2013) (Neth.) ... Add-11

## Federal Arbitration Act (excerpts)

### 9 U.S.C. § 203

An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States (including the courts enumerated in section 460 of title 28) shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy.

### 9 U.S.C. § 207

Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

## Foreign Sovereign Immunities Act (excerpt)

## 28 U.S.C. § 1605(a)(6)

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

* * *

(6) in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if

(A) the arbitration takes place or is intended to take place in the United States,

(B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards,

(C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or

(D) paragraph (1) of this subsection is otherwise applicable.

* * *

Add-2

## New York Convention,
## 21 U.S.T. 2517, 330 U.N.T.S. 3 (June 10, 1958)

\* \* \*

### *Article II*

1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

2. The term "agreement in writing" shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.

\* \* \*

### *Article V*

1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

(a) The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

(b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

(c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

Add-3

(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

(a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

(b) The recognition or enforcement of the award would be contrary to the public policy of that country.

* * *

**U.S.-Ecuador BIT,**
**Aug. 27, 1993, S. Treaty Doc. 103-15**
**(entered into force May 11, 1997)**

\* \* \*

*Article I*

1. For the purposes of this Treaty,

(a) "investment means" every kind of investment in the territory of one Party owned or controlled directly or indirectly by nationals or companies of the other Party, such as equity, debt, and service and investment contracts; and includes:

(i) tangible and intangible property, including rights, such as mortgages, liens and pledges;

(ii) a company or shares of stock or other interests in a company or interests in the assets thereof;

(iii) a claim to money or a claim to performance having economic value, and associated with an investment;

(iv) intellectual property which includes, inter alia, rights relating to: literary and artistic works, including sound recordings; inventions in all fields of human endeavor; industrial designs; semiconductor mask works; trade secrets, know-how, and confidential business information; and trademarks, service marks, and trade names; and

(v) any right conferred by law or contract, and any license and permits pursuant to law;

\* \* \*

3. Any alteration of the form in which assets are invested or reinvested shall not affect their character as investment.

*Article II*

1. Each Party shall permit and treat investment, and activities associated therewith, on a basis no less favorable than that accorded in like situations to investment or associated activities of its own nationals or companies, or of nationals or companies of any third country, whichever is the most favorable, subject to the right of each Party to

make or maintain exceptions falling within one of the sectors or matters listed in the Protocol to this Treaty. Each Party agrees to notify the other Party before or on the date of entry into force of this Treaty of all such laws and regulations of which it is aware concerning the sectors or matters listed in the Protocol. Moreover, each Party agrees to notify the other of any future exception with respect to the sectors or matters listed in the Protocol, and to limit such exceptions to a minimum. Any future exception by either Party shall not apply to investment existing in that sector or matter at the time the exception becomes effective. The treatment accorded pursuant to any exceptions shall, unless specified otherwise in the Protocol, be not less favorable than that accorded in like situations to investments and associated activities of nationals or companies of any third country.

2.    (a) Nothing in this Treaty shall be construed to prevent a Party from maintaining or establishing a state enterprise.

(b) Each Party shall ensure that any state enterprise that it maintains or establishes acts in a manner that is not inconsistent with the Party's obligations under this Treaty wherever such enterprise exercises any regulatory, administrative or other governmental authority that the Party has delegated to it, such as the power to expropriate, grant licenses, approve commercial transactions, or impose quotas, fees or other charges.

(c) Each Party shall ensure that any state enterprise that it maintains or establishes accords the better of national or most favored nation treatment in the sale of its goods or services in the Party's territory.

3.    (a) Investment shall at all times be accorded fair and equitable treatment, shall enjoy full protection and security and shall in no case be accorded treatment less than that required by international law.

(b) Neither Party shall in any way impair by arbitrary or discriminatory measures the management, operation, maintenance, use, enjoyment, acquisition, expansion, or disposal of investments. For purposes of dispute resolution under Articles VI and VII, a measure may be arbitrary or discriminatory notwithstanding the fact that a party has had or has exercised the

opportunity to review such measure in the courts or administrative tribunals of a Party.

(c) Each Party shall observe any obligation it may have entered into with regard to investments.

4. Subject to the laws relating to the entry and sojourn of aliens, nationals of either Party shall be permitted to enter and to remain in the territory of the other Party for the purpose of establishing, developing, administering or advising on the operation of an investment to which they, or a company of the first Party that employs them, have committed or are in the process of committing a substantial amount of capital or other resources.

5. Companies which are legally constituted under the applicable laws or regulations of one Party, and which are investments, shall be permitted to engage top managerial personnel of their choice, regardless of nationality.

6. Neither Party shall impose performance requirements as a condition of establishment, expansion or maintenance of investments, which require or enforce commitments to export goods produced, or which specify that goods or services must be purchased locally, or which impose any other similar requirements.

7. Each Party shall provide effective means of asserting claims and enforcing rights with respect to investment, investment agreements, and investment authorizations.

8. Each Party shall make public all laws, regulations, administrative practices and procedures, and adjudicatory decisions that pertain to or affect investments.

9. The treatment accorded by the United States of America to investments and associated activities of nationals and companies of the Republic of Ecuador under the provisions of this Article shall in any State, Territory or possession of the United States of America be no less favorable than the treatment accorded therein to investments and associated activities of nationals of the United States of America resident in, and companies legally constituted under the laws and regulations of other States, Territories or possessions of the United States of America.

10. The most favored nation provisions of this Treaty shall not apply to advantages accorded by either Party to nationals or companies of any third country by virtue of:

>(a) that Party's binding obligations that derive from full membership in a free trade area or customs union; or

>(b) that Party's binding obligations under any multilateral international agreement under the framework of the General Agreement on Tariffs and Trade that enters into force subsequent to the signature of this Treaty.

* * *

*Article VI*

1. For purposes of this Article, an investment dispute is a dispute between a Party and a national or company of the other Party arising out of or relating to (a) an investment agreement between that Party and such national or company; (b) an investment authorization granted by that Party's foreign investment authority to such national or company; or (c) an alleged broach of any right conferred or created by this Treaty with respect to an investment.

2. In the event of an investment dispute, the parties to the dispute should initially seek a resolution through consultation and negotiation. If the dispute cannot be settled amicably, the national or company concerned may choose to submit the dispute, under one of the following alternatives, for resolution:

>(a) to the courts or administrative tribunals of the Party that is a party to the dispute; or

>(b) in accordance with any applicable, previously agreed dispute-settlement procedures; or

>(c) in accordance with the terms of paragraph 3.

3.   (a) Provided that the national or company concerned has not submitted the dispute for resolution under paragraph 2 (a) or (b) and that six months have elapsed from the date on which the dispute arose, the national or company concerned may choose to consent in writing to the submission of the dispute for settlement by binding arbitration:

(i) to the International Centre for the Settlement of Investment Disputes (Centre) established by the Convention on the Settlement of Investment Disputes between States and Nationals of other States, done at Washington, March 18, 1965 (IICSID convention), provided that the Party is a party to such Convention; or

(ii) to the Additional Facility of the Centre, if the Centre is not available; or

(iii) in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL), or

(iv) to any other arbitration institution, or in accordance with any other arbitration rules, as may be mutually agreed between the parties to the dispute.

(b) Once the national or company concerned has so consented, either party to the dispute may initiate arbitration in accordance with the choice so specified in the consent.

4. Each Party hereby consents to the submission of any investment dispute for settlement by binding arbitration in accordance with the choice specified in the written consent of the national or company under paragraph 3. Such consent, together with the written consent of the national or company when given under paragraph 3 shall satisfy the requirement for:

(a) written consent of the parties to the dispute for purposes of Chapter II of the ICSID Convention (jurisdiction of the Centre) and for purposes of the Additional Facility Rules; and

(b) an agreement in writing for purposes of Article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, June 10, 1958 (New York Convention).

5. Any arbitration under paragraph 3(a)(ii), (iii) or (iv) of this Article shall be held in a state that is a party to the New York Convention.

6. Any arbitral award rendered pursuant to this Article shall be final and binding on the parties to the dispute. Each Party undertakes to

Add-9

carry out without delay the provisions of any such award and to provide
in its territory for its enforcement.

* * *

# IN THE NAME OF THE KING

ruling

_____

THE HAGUE COURT OF APPEAL

Civil law division


Case number                          : 200.112.516/01
District court case/roll numbers   : 386934/HA ZA 11-402 and 408948/HA ZA 11-2813

**ruling of 18 June 2013**

In the case of:

the legal person governed by foreign law
**THE REPUBLIC OF ECUADOR**
established in Quito, Ecuador,
appellant,
hereinafter referred to as: Ecuador,
lawyer: *mr.* G.W. van der Bend from Amsterdam,

against

    1.    the company established under foreign law
        **CHEVRON CORPORATION (USA)**,
        hereinafter referred to as: Chevron Corporation,
    2.    the company established under foreign law
        **TEXACO PETROLEUM COMPANY**,
        hereinafter referred to as: TexPet,
        both established in San Ramon, California, United States of America,
        respondent,
        hereinafter also jointly referred to as: Chevron,
        lawyer: *mr.* J.M.K.P. Cornegoor from Amsterdam.


**Course of the proceedings.**

By writ dated 1 August 2012 Ecuador appealed against the judgement pronounced between the parties by the District Court in The Hague on 2 May 2012 in the joint cases referred to in the heading of this ruling. By statement of appeal Ecuador presented eight grounds of appeal against the judgement that were contested by Chevron in its statement of defence with exhibits.

The parties pleaded the case on 13 May 2013; Ecuador by *mr.* E.D. Van Geuns, lawyer from Amsterdam, and Chevron by its aforementioned lawyer, both on the basis of written pleas that have been added to the case file. Prior to the pleading Ecuador submitted additional documents that are specified in the official report that was drawn up in respect of the hearing and which form part of the case file.

The parties then requested a ruling.


CERT. MERRILL VER

**Assessment of the appeal**

*Introduction*

1.    The facts established by the district court in grounds for the decision 2.1 up to and including 2.7 of the contested judgement have not been contested, therefore the court of appeal also assumes this. The appeal concerns the following.

1.1    Chevron Corporation is indirectly a shareholder of TexPet. At the beginning of the 1960s Ecuador granted TexPet a concession for the extraction of oil and for oil exploration in the Amazon region of Ecuador. In 1971 Ecuador set up a state oil company, CEPE, later Petroecuador (CEPE/PE). In 1973 the terms of the 1964 concession were renegotiated and the parties entered into a concession agreement for a period of 19 years which related to a smaller area in the Amazon basin (hereinafter referred to as the Concession Agreement).

1.2    The Concession Agreement ended on 6 June 1992 when the term ended. On 17 November 1995 Ecuador, CEPE/CE and TexPet concluded a Global Settlement Agreement and Release (hereinafter referred to as: the Global Settlement Agreement) in relation to the termination and settlement of the Concession Agreement. Amongst other things, this provided for repairing the environmental damage caused by the oil extraction.

1.3    In the period from December 1991 up to December 1993 TexPet initiated seven sets of proceedings with the Ecuadorian courts in relation to what TextPet called culpable breaches by Ecuador under the Concession Agreement. According to Texpet, Ecuador had systematically violated the Concession Agreement by representing the domestic requirement as too high and demanding more oil from TexPet above that which it was entitled to and which it then exported itself. In those proceedings TexPet claimed more than USD 354 million in respect of the excessive oil deliveries to Ecuador for which, according to TexPet, Ecuador should have paid the international market price instead of the lower domestic price.

1.4    In 1993 the United States of America (Hereinafter referred to as: the US) and Ecuador concluded a Bilateral Investment Treaty (hereinafter referred to as: BIT or: the treaty) which entered into force on 11 May 1997. Article VI of the BIT contains an arbitration clause.

1.5    On 21 December 2006 Chevron instigated a BIT arbitration procedure against Ecuador. In that arbitration, according to the UNCITRAL Rules, Charles N. Brower, A.J. van den Berg and K-H Böckstiegel were appointed as arbitrators (hereinafter referred to as: the Arbitral Tribunal). In the arbitration Chevron adopted the position that Ecuador was liable for the damage that Chevron had suffered due to (amongst other things) breach of Article II(7) of the BIT. That breach was, according to Chevron, the result of an unacceptable delay in the conclusion of the seven proceedings by the Ecuadorian courts.

1.6    In the arbitral interim award of 1 December 2008 (hereinafter referred to as: 'the Interim Award) the Arbitral Tribunal declared itself to be competent to take cognizance of the Chevron claims. In the arbitral (partial) final award of 30 March 2010 ('the

CERT. MERRILL VER

Partial Award') the Arbitral Tribunal found that Ecuador was guilty of a denial of justice in relation to the undue delay because a judgement in the 7 proceedings had not been given in a timely manner by the Ecuadorian courts. For that reason Ecuador was ordered to pay compensation to Chevron. In its arbitral final award ('the Final Award') of 31 August 2011 the Arbitral Tribunal set the level of compensation at USD 96,355,369.17 (including interest).

2.    In the proceedings with case number 11-402 Ecuador applied for the Interim Award of 1 December 2008 and the Partial Award of 30 March 2010 to be set aside. In the proceedings with case number 11-2813 Ecuador applied for the Final Award of 31 August 2011 to be set aside. Ecuador founded this on claiming that a valid agreement for arbitration was lacking and that the Arbitral Tribunal had therefore incorrectly declared itself to be competent in the Interim Award, so that the arbitral judgements were rendered liable for set aside on the grounds referred to in Article 1065 paragraph 1 sub a of the Netherlands Code of Civil Procedure. In addition, in the first instance Ecuador argued that on a number of points the Arbitral Tribunal had breached its remit by failing to consider essential defences from Ecuador. In part for this reason the arbitral judgements were, according to Ecuador, not reasoned. With regard to this, Ecuador referred to the grounds for set aside in Article 1065 paragraph 1, sub c and d of the Netherlands Code of Civil Procedure.

3.    The court dismissed both grounds and rejected the claims.

*Competency and applicable law*

4.    It is established between the parties that the Netherlands is applicable as the place of arbitration, so that on the basis of Article 1073 paragraph 1 of the Netherlands Code of Civil Procedure the provisions of Title 1 of Book 3 of the Netherlands Code of Civil Procedure (Articles 1020-1073 of the Netherlands Code of Civil Procedure) are applicable to these proceedings. Now that the arbitral judgments have been lodged with the District Court in The Hague, the District Court and the Court of Appeal in The Hague derive competency from Article 1064 paragraph 2 of the Netherlands Code of Civil Procedure.

*Assessment of the appeal*

5.    As is evident from the grounds of appeal, only the first stated ground for set aside, namely: the lack of a valid arbitration agreement, and with that the competency of the Arbitral Tribunal, is to be considered. In this regard the court has considered that the competency of the Arbitral Tribunal is based on an agreement that is deemed to be embodied in the BIT, whereby Article VI paragraph 4 of the BIT applies as an open offer from one state that is party to the treaty to nationals and companies of the other state that is party to the treaty for '*any investment dispute'* to be settled through arbitration (ground for the decision 4.10). In ground for appeal 4 Ecuador complains about the element of the consideration that the arbitration agreement is embodied in the BIT. According to Ecuador that is incorrect because Article VI of the BIT only contains an offer from the state that is a party to the treaty to nationals of the other state that is party to the treaty. The ground for appeal fails. After all, the District Court has explained this in greater detail in the continuation of the relevant consideration.

6.    With the question raised in the other grounds for appeal in mind about whether the BIT includes an offer as referred to above for the settlement of the dispute presented to the Arbitral Tribunal, the Court of Appeal shall now quote the relevant sections from the BIT.

The title reads:

*"Treaty (…) concerning the Encouragement and reciprocal Protection of Investment"*

The preamble states, amongst other things:

*Desiring to promote greater economic cooperation between them* (de Verenigde Staten en Ecuador), *with respect to investment by nationals and companies of one Party in the territory of the other Party;*

*Recognizing that agreement upon the treatment to be accorded such investment will stimulate the flow of private capital and the economic development of the Parties;*

*Agreeing that fair and equitable treatment of investment is desirable in order to maintain a stable framework for investment and maxim effective utilization of economic resources;*

The relevant provisions read as follows:

*Article I*

*1. For the purposes of this Treaty,*

*(a) "investment" means every kind of investment in the territory of one Party owned or controlled directly or indirectly by nationals or companies of the other Party, such as equity, debt, and service and investment contracts; and includes:*

*(i) tangible and intangible property, including rights, such as mortgages, lions and pledges;*

*(ii) a company or shares of stock or other interests in a company or interests in the assets thereof;*

*(iii) a claim to money or a claim to performance having economic value, and associated with an investment;*

*(iv) intellectual property which includes, inter alia, rights relating to:*
*literary and artistic works, including sound recordings;*
*inventions in all fields of human endeavor;*
*industrial designs;*
*semiconductor mask works;*
*trade secrets, know-how, and confidential business information; and*
*trademarks, service marks, and trade names; and*

*(v) any right conferred by law or contract, and any license and permits pursuant to law;*

*(...)*

CERT. MERRILL VER

Add-14

(e) "associated activities" include the organization, control, operation, maintenance and disposition of companies, branches, agencies, offices, factories or other facilities for the conduct of business; the making, performance and enforcement of contracts; the acquisition, use, protection and disposition of property of all kinds including intellectual property rights; the borrowing of funds; the purchase, issuance, and sale of equity shares and other securities; and the purchase of foreign exchange for imports.

(…)

3. Any alteration of the form in which assets are invested or reinvested shall not affect their character as investment.

Article II

(...)
7. Each Party shall provide effective means of asserting claims and enforcing rights with respect to investment, investment agreements, and investment authorisations.
(...)

(…)

Article VI

1. For purposes of this Article, an investment dispute is a dispute between a Party and a national or company of the other Party arising out of or relating to (a) an investment agreement between that Party and such national or company; (b) (...); or (c) an alleged breach of any right conferred or created by this Treaty with respect to an investment.
(...)
3. (a) Provided that the national or company concerned has not submitted the dispute for resolution under paragraph 2 (a) or (b) and that six months have elapsed from the date on which the dispute arose, the national or company concerned may choose to consent in writing to the submission of the dispute for settlement by binding arbitration:
(i) to the International Centre for the Settlement of Investment Disputes ("Centre") established by the Convention on the Settlement of Investment Disputes between States and Nationals of other States, done at Washington, March 18, 1965 (IICSID convention"), provided that the Party is a party to such Convention; or
(ii) to the Additional Facility of the Centre, if the Centre is not available; or
(iii) in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL), or
(iv) to any other arbitration institution, or in accordance with any other arbitration rules, as may be mutually agreed between the parties to the dispute.
4. Each Party hereby consents to the submission of any investment dispute for settlement by binding arbitration in accordance with the choice specified in the written consent of the national of company under paragraph 3. Such consent, together with the written consent of the national or company when given under paragraph 3 shall satisfy the requirement for:

CERT. MERRILL VER

Add-15

*(a) written consent of the parties to the dispute (...); and*
*(b) an "agreement in writing" (...).*

*(...)*

*Article XII*

*1. This Treaty (...) shall apply to investments existing at the time of entry into force as well as to investments made or acquired thereafter. (...)"*

7.  Ecuador bases its appeal on a lack of competency on the part of the Arbitral Tribunal on the argument that because the TexPet investment in Ecuador ended on 6 June 1992, while the BIT first came into force on 11 May 1997, that with due regard for Article XII there is no evidence of an investment that is covered by the scope of the BIT and that consequently there is no investment dispute as referred to in Article VI (the arbitration clause) of the BIT.
    Chevron has conducted a twofold defence against this:
    a) a distinction has to be made between the competency of the Arbitral Tribunal, which should be tested exclusively against that which is stipulated in Article VI of the BIT, and the question as to whether Ecuador has breached its obligations under the treaty; only in the context of the last question is it important whether the interests for which Chevron requires protection are covered by the scope of the treaty;
    b) if this was to be judged differently, it applies that indeed there is evidence of an existing investment in the sense of the treaty at the time that the BIT came into force.

8.  In the arbitration the parties have accordingly taken their positions.
    Without apparently dealing with the distinction argued by Chevron (as above under a), the Arbitral Tribunal has ruled, in brief, that it is competent because at the time that the BIT came into force there was evidence of an existing investment in the sense of Article I (and XII) of that treaty.

9.  With regard to the competency of the Arbitral Tribunal the District Court considered, in brief:

    i) that when testing against Article 1065 paragraph 1 sub a of the Netherlands Code of Civil Procedure the Court should not act with restraint and should fully test the competency of the arbitrators (ground for the decision 4.5);
    ii) that Ecuador has not contested that the dispute between the parties arises from, or relates to the Concession Agreement which, in the sense of Article VI paragraph 1 sub a, can be deemed to be an investment agreement, and has not contested that the dispute between the parties forms a dispute in the sense of Article VI paragraph 1 sub c, so that there is compliance with the conditions prescribed in Article VI for settlement of the dispute by the Arbitral Tribunal (ground for the decision 4.10);
    iii)  that the full test of the competency of the Arbitral Tribunal pursuant to Article 1065 paragraph 1 sub a of the Netherlands Code of Civil Procedure does not mean that the District Court also has to give a judgment about the follow-on question about whether the arbitration clause in Article VI has to be read in conjunction with Article XII of the BIT, and in that sense restricts the (temporal) scope of the arbitration clause; that a distinction has to be made between, on the one hand, the question about the competency of the Arbitral Tribunal for settling the dispute presented by Chevron (the question about a valid arbitration agreement) and, on the other hand, the question about the competency of the Arbitral Tribunal to make a judgment about investments that had

CERT. MERRILL VER

Case number: 200.112.516/01                                                                 7

ended at the time that the BIT entered into force (the interpretation of the scope of Article XII), such question not being presented to the District Court for full testing (ground for the decision 4.11); and that also from the text of Article VI it follows that this contains an entirely independent provision, because it is not apparent from this that when assessing the question as to whether there is evidence of an '*investment dispute*' one has to return to the definition of Article I or the temporal scope of Article XII (ground for the decision 4.12).

The District Court has thus upheld the Chevron defence referred to above under a).

10.     In ground for the appeal 1, Ecuador argues that, insofar as the District Court finds that the judge should also show the restraint as referred to in ground for the decision 4.4 for an application to set aside based on Article 1065 paragraph 1 sub a of the Netherlands Code of Civil Procedure (non-competency), then this is incorrect. The ground for appeal fails. After all, it is apparent from ground for the decision 4.5 that the District Court (correctly) endorses a full test with regard to that ground for set aside.

11.     Grounds for appeal 2, 3 and 5 relate to the opinion of the District Court that the content of Articles I and XII should not be involved in the assessment of the competency of the Arbitral Tribunal (for this see ground for the decision 9, under iii)). Grounds for appeal 6 and 7 argue that at the time that the BIT entered into force there was no existing investment and that the offer from Ecuador to settle disputes through arbitration contained in Article VI of the BIT was, for that reason, not applicable to the dispute brought before the Arbitral Tribunal by Chevron. To support its grounds for appeal Ecuador refers to the text of Articles I, VI and XII of the treaty, as well as the purpose of it.

12.     The first point of dispute between the parties is whether the content of Articles I and XII has to be involved when assessing the competency of the Arbitral Tribunal. On this point the Court of Appeal arrives at a different opinion than the District Court. It is correct that the question of competency is a different question from the question about whether the claims are allowable. It is also correct that an arbitral clause should be regarded as a separate agreement (Article 1053 of the Netherlands Code of Civil Procedure) when assessing the competency of the arbitrators. However, that does not detract from the fact that the question of competency cannot be answered without involving the question about whether, when interpreting the arbitral clause (Article VI of the BIT), the content of Articles I and XII has to be involved. Whether that is the case is a question of the actual interpretation of Article VI.

13.     The parties do not dispute that the BIT should be interpreted in accordance with the rules set out in the Vienna Convention on Treaties (1969), hereinafter referred to as: VCT. The relevant provisions of this read as follows (in the English text):

*Article 31*
*General rule of interpretation*

*1. A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.*
*2. The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:*
*(a) any agreement relating to the treaty which was made between all the parties in connection with the conclusion of the treaty;*

CERT. MERRILL VER

Add-17

*(b) any instrument which was made by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.*
*3. There shall be taken into account, together with the context:*
*(a) any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;*
*(b) any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;*
*(c) any relevant rules of international law applicable in the relations between the parties.*
*4. A special meaning shall be given to a term if it is established that the parties so intended.*

*Article 32*
*Supplementary means of interpretation*

*Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:*
*(a) leaves the meaning ambiguous or obscure; or*
*(b) leads to a result which is manifestly absurd or unreasonable.*

Thus, a treaty should in the first instance be interpreted in accordance with the meaning of the phrasing contained therein when used in normal speech, viewed in the context in which they have been placed and with due regard for the purpose of the treaty (Article 31 paragraph 1). A term has a special meaning if it is established that the parties had intended this (Article 31 paragraph 4). The context of the provision to be interpreted consists of, apart from the preamble and the text of the treaty, any agreement or other instrument accepted by the parties relating to the conclusion of the treaty (Article 31 paragraph 2). In addition to the context, when interpreting, any other agreements, amongst other things, between the parties to the treaty relating to the interpretation and application of the treaty, should be taken into account, as should the manner in which the treaty is applied in practice ('subsequent state practice') (Article 31 paragraph 3).
This primary standard of interpretation is denoted as the objective or textual method. The history surrounding the formation of the treaty (including the '*traveaux préparatoires*') belongs, according to Article 32 of the VCT, to the secondary sources of interpretation.

14.     The parties have stated that, in addition to the content of the actual BIT, there are no relevant sources of interpretation in the aforementioned sense (according to the written pleading from Ecuador in the first instance, under 2.4 and 2.5). During the pleading opportunity at the appeal hearing the lawyer for Ecuador notified, when asked, that nothing was known about the formation of the treaty other than that there were many of these types of treaties with similar content. The only sources that the parties have referred to are: the '*submittal note*' with which the BIT was presented to the Congress of the United States by President Clinton (Chevron) and the position of the United States in the *Mondev* arbitration (Ecuador) that is to be discussed later. The *submittal note* does not qualify as an interpretation instrument as referred to in Article 31 paragraph 2 of the VCT. With regard to the question about whether the position of the United States can be regarded as a relevant part of *state practice* this shall be addressed later by the Court of Appeal.

CERT. MERRILL VER

Add-18

15.   The starting point for assessing the competency question is the arbitral clause, i.e. Article VI of the BIT. Unlike the District Court, the Court of Appeal is of the opinion that the mere fact (if correct) that from the phrasing of Article VI it is not apparent that one has to refer back to the definition provision of Article I and/or the provisions relating to the temporal scope of the treaty (Article XII) is not decisive for answering the question whether the content of those provisions has to be involved when interpreting Article VI. After all, when interpreting a treaty provision the phrasing must be interpreted in light of its context (including the further content of the treaty) and the purpose of the treaty. The fact that Article VI has to be regarded as a separate agreement for assessing the competency of the Arbitral Tribunal does not detract from this (for this see ground for the decision 12).

16.   To substantiate the competency of the Arbitral Tribunal, Chevron has relied on two grounds referred to in Article VI: paragraph 1, opening words and under a) and paragraph 1, opening words and under c). The Court of Appeal sees reason to discuss this latter ground first. Article VI paragraph 1, opening words and under c) reads:

> "For purposes of this Article, an investment dispute is a dispute between a Party and a national or company of the other Party arising out of or relating to (...) (c) an alleged breach of any right conferred or created by this Treaty with respect to an investment."

From the underlined section of the sentence (underlined by the Court of Appeal) it appears that in the actual arbitral clause (at least with regard to the ground being discussed here) a link is established between the dispute and the scope (also referred to by the parties as: "the scope of protection") of the treaty. After all, in ground c) arbitration is offered as a means of settling disputes for disputes relating to rights that are created or conferred by the treaty. In this context, Chevron is invoking the right, assigned to it in Article II, paragraph 7 of the BIT. With that it is important whether Chevron is able to rely upon that right and it is inevitable that the applicability of the BIT is assessed *ratione materiae* and *ratione temporis*. That thus the opinion about 'the scope of protection' of the treaty – insofar as, in other words: in order to be able to assess the competency of the Abritral Tribunal – is submitted to the national regular court for full testing, is a consequence of the way in which the parties to the treaty have expressed the arbitral clause. Unlike the argument put forward by Chevron, this does not stand in the way of the aforementioned assessment.

17.   With regard to the applicability of the BIT *ratione temporis* Article XII, paragraph 1, stipulates:

> "This Treaty (...) shall apply to investments existing at the time of entry into force as well as to investments made or acquired thereafter. (...)"

Apart from the question about whether that also applies when the word '*investment*' is used as an adjective – for example as part of the term '*investment dispute*' or '*investment agreement*' – it is, in the opinion of the Court of Appeal, in any event not subject to doubt that for establishing the meaning of the word '*investment*' (noun) in the provisions of the BIT, the definition of this term in Article 1 of the treaty is the determining factor. This follows from Article I, paragraph 1, opening words under a):

Case number: 200.112.516/01
10

*"For the purpose of this Treaty,*

*(a) "investment" means (…)"*

It has to be accepted that except when there are indications to the contrary, each time when the word '*investment*' appears in the treaty, this has to be interpreted in the sense defined in Article I. After all, that is the purpose of a definition clause. The Court of Appeal has not seen any indication that the term '*investment*' in Article XII, paragraph 1 ("*It shall apply to investments..*") has to be interpreted differently than in the sense described in Article I.

18.   The question about how '*investment*' is defined in Article I now has to be answered. In this context it is important that it is established between the parties that the 1992 Concession Agreement has ended and with that the oil extraction activities that were the subject of the Agreement. It is also an established fact between the parties that these activities (in any event) qualify as '*investment*' in the sense of the BIT. The Court of Appeal shall hereinafter designate these activities as "the operational phase".
Chevron is of the opinion that at the time the BIT entered into force (11 May 1997) there was still an investment in the sense of the treaty. It argues that the term 'investment' in the BIT and also in the 'BIT practice' is defined broadly and that it covers the entire lifecycle of an investment, including the winding up phase. Chevron points out that the list of the forms of investment in Article I (a) of the BIT is not limitative. Both the claims that Chevron has brought before the Ecuadorian courts (for this see ground for the decision 1.3) and the activities that it undertook in order to (according to Ecuador) repair the environmental damage caused in the operational phase, qualify, according to Chevron, as investment in the winding up phase. More specifically, according to Chevron the stated rights of action fall under the '*claims*' or '*rights*' referred to in Article I, paragraph 1 sub (a) (iii) and (v).

19.   Ecuador does not contest that the description of 'investment' in Article I(a) of the BIT is broad and that the list is not limitative. Nor does it contest that the winding up of an investment is covered by 'the scope of protection' of the BIT. However, according to Ecuador, due to that which is stipulated in Article XII, what it calls "additional protection" only comes into effect when it concerns an investment that was still in the operational phase at the time that the BIT entered into force (see amongst other things the written pleading from Ecuador in the first instance, under 4.4.), or at any rate, as further explained by Ecuador in the pleading during the appeal, in a phase that contributes to the economy of the country in which the investment was made. According to Ecuador that follows from the purpose of the BIT, which it further describes as the encouragement of investments. Protection of investments for which the operational phase has already ended can, according to Ecuador, not contribute to the purpose. More specifically, according to Ecuador, neither Chevron's rights of action or the activities relating to the clearing up of environmental damage, contributed to its economy.
As regards the text from Article I (a), Ecuador argues that the circumstance that phenomena listed under (i) up to and including (v)  are covered by the definition by virtue of the opening words of (a), does not mean that the relevant elements themselves are elevated to become investments. For example, according to Ecuador, Chevron's rights of action can be designated as a '*claim to money*' as referred to under (c) but cannot in themselves be regarded as '*investment*'. In addition, (with regard to element (c)) it argues that it is required that those claims are '*associated with an investment*', whereby '*investment*' has to be

defined as an investment in an operational sense or at least an investment in a phase that contributes to the economy of the relevant country, at the moment that the treaty enters into force.

20.     The Court of Appeal is of the opinion that the interpretation thus given by Ecuador for the term 'investment' in Articles I and XII is not tenable. The following is considered in regard to this.

21.     As is apparent from the title and the preamble of the BIT, the purpose of the treaty is to encourage and protect investments, made by nationals of a state that is party to the treaty, in the other state that is party to the treaty. Protection is provided by a fair and reasonable treatment of investments. In that sense, protection of the investments serves to encourage (new) investments; also see the second part of the preamble, in which is it is recognised that "*agreement upon the treatment to be accorded such investment will stimulate the flow of private capital and the economic development of the Parties*". In addition, it can be regarded as an empirical fact that a fair winding up of an investment is conducive to attracting new investments. The fact put forward by the parties that throughout the world thousands of such bilateral investment treaties have been concluded provides confirmation of this.

22.     From the statements made by the parties it follows (in both of their perceptions) that in normal use of language '*investment*' means: the operational phase. It is already apparent from Article I (a) that the term '*investment*' in the BIT has a broader meaning. Ecuador also recognises this (for this see ground for the decision 19). Insofar, it is apparent from the actual treaty that there is compliance with that which is stipulated in Article 31, paragraph 4 of the VCT.
        From the words in Article I (a), opening words, "*and includes*" it follows that the phenomena stated in the subsequent list (i) up to and including (v), are made part of the term '*investment*'. Thus, amongst other things, '*claims to money, associated with an investment*' (under iii) belong to an '*investment*' under the BIT.
        The Court of Appeal is of the opinion, together with Chevron and the Arbitral Tribunal, that the word '*investment*' in the designation '*associated with an investment*', like the second word in the phrase '"*investment" means every kind of investment*' in the opening words of Article I (a), is manifestly intended to have the meaning that the word has in normal language usage. After all, a circular definition would otherwise exist which, from the point of view of logic and practicality, would not be obvious.
        An investment in the sense of Article I (and therefore: in the sense of the treaty) covers ('*includes*') therefore (amongst other things) a right of action that is associated with an investment in the operational sense. The provision in paragraph 3 of Article I, which states that a change to the form in which resources are invested does not remove the character of an investment, is in line with this.

23.     The Court of Appeal rejects the arguments by Ecuador that a right of action can only be associated with an investment in the sense of Article I (a) (iii) if that investment (in an operational sense) still existed when the treaty entered into force. That does not follow from the phrasing of Article I. Furthermore, this interpretation would result in the word '*investments*' in Article XII having the meaning that is designated to it in normal language usage rather than the meaning as defined. As the Court of Appeal for this in ground for the decision 17, has considered, there is no indication whatsoever that the word '*investments*' in Article XII has to be interpreted differently than how it is (more broadly) defined in Article I.
        Such an indication, unlike Ecuador's argument, does not exist in the purpose of the BIT. As considered for this in ground for the decision 21, a fair and reasonable winding up of

CERT. MERRILL VER

an investment (in the meaning according to normal language usage) is conducive to attracting new investments and is thus conducive to the investment climate. That applies equally to the winding up of investments for which the operational phase has already ended.

Insofar as Ecuador is relying on its own intention that deviates from this, meaning that it did not wish its offer of arbitration for investment disputes to extend to investments for which the operational phase had already ended when the treaty entered into force, or alternatively which no longer contributed to its economy, this is not taken into account by the Court of Appeal. Pursuant to the interpretation rules set out in the VCT the (unilateral, not expressed in the treaty) intention of a party is, after all, not normative.

24.     Ecuador's reliance on the stance adopted by the United States in the *Mondev* arbitration does not lead to a different interpretation. That arbitration was based on the North American Free Trade Agreement (NAFTA) concluded between the United States, Canada and Mexico in 1994. In that arbitration the United States was taken to court for its handling of a claim by a Canadian investor by the judicial authorities in the state of Massachusetts. In this matter the operational phase of the investment had also ended when the treaty entered into force. The United States argued that the arbitrators did not have competency on the basis of grounds similar to those put forward by Ecuador in these proceedings. However, this adopted course of action cannot be qualified as '*state practice*' on the part of the United States which, pursuant to Article 31 paragraph 3 sub b of the VCT is relevant for the interpretation of the BIT in question. After all, this does not concern '*state practice*' when applying the BIT in question. The condition that this '*practice' 'establishes the agreement of the parties regarding its interpretation'* referred to in Article 31 paragraph 3 sub b of the VCT is also not complied with.

25.     It is established that at the moment the BIT entered into force Chevron had rights of action as referred to in Article I(a) (iii) of the treaty and therefore had an 'investment' in the sense of Article I (a) and (therefore) Article XII, paragraph 1. This means there was an '*alleged breach of any right conferred or created by this Treaty with respect to an investment*' in the sense of Article VI paragraph 1, sub c. The fact that the dispute settled by the Arbitral Tribunal about the question as to whether the handling of those rights of action complied with the obligations set forth in Article II, paragraph 7 of the BIT (in brief: the offering of an effective course of proceedings), qualifies as a '*dispute arising out or relating to*' such an '*alleged breach*' is not in dispute. The dispute brought before the Arbitral Tribunal by Chevron is therefore covered by the scope of the offer to nationals of the other party to the treaty to have the dispute settled by means of arbitration as included in Article VI of the BIT, therefore in this matter the Arbitral Tribunal was indeed competent.

26.     With this state of affairs no decision needs to be made on whether:
i) Chevron's rights of action also qualify as '*rights*' in the sense of Article I (a) (v);
ii) the activities (on the instructions) of Chevron relating to repairing environmental damage can be regarded as '*investment*' in the sense of the BIT;
iii) the Arbitral Tribunal was also able to derive competency from Article VI, paragraph 1, sub a.

27.     The Court of Appeal further considers that, although that argument was not (in so many

CERT. MERRILL VER

words) part of Ecuador's grounds for appeal, the opinion of the Court of Appeal does not mean that – in deviation from that which is stipulated in Article 28 of the VCT – retroactive force can be derived from the BIT. Pursuant to Article XII of the treaty this is applicable to existing and future investments in the sense of Article I (a). There is thus mention of immediate effect. Furthermore, it is not contested that the dispute about the breach of Article II paragraph 7 of the treaty arose after the treaty entered into force and that the arbitrators have only assessed the actions of Ecuador after that.

28.     Considering the above, the grounds for appeal 2, 3 and 5 succeed, however, considering the failure of grounds for appeal 6 and 7, this cannot lead to set aside of the contested judgement. Ground for appeal 8, regarding the burden of proof with regard to the existence of a valid arbitration agreement, does not require any discussion.

29.     As the party failing to succeed in its action, Ecuador is ordered to pay the costs of the appeal.

**Decision**

The Court of Appeal

upholds the appealed judgement;

orders Ecuador to pay the costs of the appeal proceedings, so far estimated at € 666 for expenses and € 2,682 in salaries;

declares this ruling provisionally enforceable as regards the order to pay costs.

This ruling was rendered by *mr.* T.H. Tanja-van den Broek, *mr.* M.Y. Bonneur and *mr.* B. Smulders and was pronounced in open court on 18 June 2013 in the presence of the Clerk of the Court.

[*3 x signatures*]

**Issued as a true bailiff's copy to *mr. J.M.K.P. Cornegoor*, lawyer for the ~~appellant~~/respondent.**
**The Clerk of the Appeal Court in The Hague**

CERT. MERRILL VER

Add-23

# MERRILL CORPORATION

Merrill Communications LLC



225 Varick Street
New York, NY 10014 • (212) 620-5600

State of New York )
Staat van New York )

)                    ss:
)                    te weten:

County of New York )
County van New York )

**Certificate of Accuracy**
**Certificaat van nauwkeurigheid**

This is to certify that the attached translation is, to the best of our knowledge and belief, a true and accurate translation from Dutch into English of the attached document.

Hierbij wordt verklaard dat bijgevoegde vertaling van bijgevoegd document, naar eer en geweten, een getrouwe en nauwkeurige vertaling is van de Nederlandse naar de Engelse taal.

Dated: July 9, 2014
Datum: 9 juli 2014

_____
Nathan Haselby
Project Manager – Legal Translations
Merrill Brink International/Merrill Corporation
_____
           [handtekening]
Nathan Haselby
Project manager - Juridische vertalingen
Merrill Brink International/Merrill Corporation

Sworn to and signed before
Beëdigd en ondertekend in
aanwezigheid van
Me, this _____9th____ day of
de notaris op dag __9__ van
_____July_____ 2014
de maand ____juli____ 2014

ROBERT J. MAZZA
Notary Public, State of New York
No. 01MA5057911
Qualified in Kings County
Commission Expires April 1, 2018

_____
Notary Public
Publieke Notaris

[ondertekend door]
[zegel]

OFFICES IN MAJOR CITIES THROUGHOUT THE WORLD

Add-24